### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| **J. DOE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.  3:25-CV-** |
| | : | |
| **ALBEMARLE COUNTY SCHOOL BOARD** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff respectfully requests that the Court grant a temporary restraining order prohibiting Defendant from permitting Western Albemarle High School ("WAHS") Turning Point USA ("TPUSA") club (the "Club") from hosting guest speaker, Victoria Cobb, and an event titled "Two Genders: One Truth" (the "Event")[1] until this Court determines whether a longer preliminary injunction is warranted pending a final judgment on the merits.

By permitting the Event, Defendant has acted with deliberate indifference to what can be reasonably anticipated to be discriminatory speech targeting transgender and gender diverse[2] students, thus amounting to a violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a). A Memorandum of Points and Authorities in support of this Motion, along with a proposed Order, are attached hereto.

---

[1] The Event is currently scheduled for lunch time on November 19, 2025. Exhibit 14.
[2] This term describes members of the many varied communities of individuals with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. See Exhibit 13 - World Professional Association for Transgender Health's (WPATH) Standards of Care—Eighth Edition (SOC-8), at 13.

Respectfully submitted,

/s/ *Alexis I. Tahinci*

Alexis I. Tahinci
VSB No. 85996
Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
Tel: (423) 406-1151
Fax: (423) 815-1728
alexis@tahincilaw.com


Lauren E. Baum, Esq.
Law Office of Lauren E. Baum, PC
240 W Main St
Suite 100 - V32
Charlottesville, VA 22902
202-450-1396
l.baum@laurenebaumlaw.com
*Application for admission pro hac vice pending*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | | |
|---|---|---|
| **J. DOE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No.  3:25-CV-** |
| | : | |
| **ALBEMARLE COUNTY SCHOOL BOARD** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff respectfully submits the following memorandum of law in support of their motion for a temporary restraining order prohibiting Defendant from permitting Western Albemarle High School ("WAHS") Turning Point USA ("TPUSA") club (the "Club") from hosting guest speaker, Victoria Cobb, and an event titled "Two Genders: One Truth" (the "Event")[3] until this Court determines whether a longer preliminary injunction is warranted pending a final judgment on the merits.

By permitting the Event, Defendant has acted with deliberate indifference to what can reasonably be anticipated to be discriminatory speech targeting transgender and gender diverse[4] students, thus amounting to a violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a). Defendant knows that the Event will result in discrimination against transgender and gender diverse students. Defendant knows that its decision to permit the Event will cause those students to undergo harassment or make them vulnerable to it. Defendant's

---

[3] The Event is currently scheduled for lunch time on November 19, 2025. Exhibit 14.
[4] This term describes members of the many varied communities of individuals with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. See Exhibit 13 - World Professional Association for Transgender Health's (WPATH) Standards of Care—Eighth Edition (SOC-8), at 13.

decision to permit the Club to proceed with the Event is deliberately indifferent to the rights and harm that the Event will cause to transgender and gender diverse students.

## BACKGROUND

The Event

On or about September 25, 2025, WAHS Principal Jennifer Sublette received a flyer for the Event, which the Club had planned for October 1, 2025. Exhibit 1 - Founding Freedoms Law Center ("FFLC") Demand Letter; Superintendent Matt Haas Statement at October 9, 2025 School Board Meeting.[5] For the Event, the Club planned to host guest speaker Victoria Cobb, President of the Family Foundation, to give a presentation titled "Two Genders: One Truth." Exhibit 1.

Family Foundation of Virginia is a socially conservative and Christian fundamentalist lobbying organization headquartered in Richmond, Virginia.[6] Victoria Cobb and the Family Foundation deny that being homosexual or transgender is immutable.[7] They are opposed to same-sex marriage[8] and advocate for policies denying the identities and rights of transgender and gender diverse individuals.[9]

Victoria Cobb's public comment on this topic was dismissive and hostile towards transgender and gender diverse individuals.[10] The title of the presentation, in and of itself, makes it clear that the Event will demean and call into question the identities of transgender and gender diverse individuals, cutting to their core and belittling their place in society. This Event can reasonably be anticipated to serve to reinforce and emphasize a feeling of

---

[5] October 9, 2025 School Board Meeting Recording, Superintendent statement, minute 8:00, https://www.k12albemarle.org/school-board/school-board-meeting-videos.
[6] https://www.familyfoundation.org/
[7] https://www.familyfoundation.org/genderandhumandesign
[8] https://www.familyfoundation.org/marriage
[9] https://www.familyfoundation.org/genderandhumandesign
[10] https://www.facebook.com/reel/24434779722882414

inferiority for transgender and gender diverse students in a way that is unlikely to ever be
undone.

The same day that she saw the Event flyer, Principal Sublette determined that it
could not proceed as planned. Exhibit 1. As a result, she informed the Club that the event
could not happen during the school day:[11]

> Thank you for meeting with me today. During our meeting we discussed your club's
> plans to host Victoria Cobb from the Family Foundation on October 1 as a guest
> speaker on the topic "Two Genders One Truth" to quote from the flyer that was left
> in my mailbox before school this morning.
>
> During our time together, I pointed out that you and I had reviewed the club's plans
> for guest speakers at the start of the year and that this speaker had not been discussed
> at that time. I expressed my position that gender identity is a complex and
> controversial topic and that I wanted to support your club while also ensuring that
> hosting an open event focusing on this topic would not lead to a disruption to our
> instructional day. In addition to the mature content of this speaker, as you know our
> lunch period is 35 minutes long and we have previously had issues with special
> speaker events for TPUSA running over into the instructional block.
>
> My direction was that this club event would need to be offered after the school day.
> I offered open access to our building and supervision for students before and after the
> event given that our student activity bus runs at 6:45.
> Again, thank you for meeting with me. As I have shared with you before, I have
> appreciated that we have been able to work together to support your club activities
> and ensure students have access to the chapter you have created.

Principal Sublette was aware of and considered the potential for harm to transgender and
gender diverse students when she determined that the Event could not proceed as planned
because it would result in disruption.

On September 26, 2025, the Founding Freedoms Law Center ("FFLC") sent a
demand letter to Defendant's Counsel, Josiah Black. Exhibit 1. The demand letter, sent on
behalf of the Club, its sponsoring teacher, Michelle Karpovich, and guest speaker Victoria

---

[11]https://www.schillingshow.com/2025/09/26/1a-no-way-western-albemarle-hs-cancels-scheduled-tpusa-two-genders-event/

Cobb, argued that the Defendant was engaged in unlawful viewpoint discrimination.

On or about September 30, 2025, Defendant relented to legal pressure from FFLC and reversed its decision to prohibit the event from proceeding during the school day.[12]

Community Backlash

On or about October 3, 2025, after significant community backlash regarding the Event, Defendant issued a Community Message[13] signed by Dr. Matthew Haas (Superintendent), Dr. Kate Acuff (School Board Chair), and Dr. Rebecca Berlin (School Board Vice-Chair). The Community Message affirmed Defendant's commitment to the safety, well-being, and success of every student and acknowledged its responsibility to maintain a safe and respectful school environment, free from discrimination, regardless of background and identity. The Community Message also expressly acknowledged that the Defendant's decision to permit the Event has left many feeling invalidated.

Defendant's next regular board meeting was scheduled for October 9, 2025.[14] Anticipating a larger than usual turnout and substantial disruption, the Defendant arranged for a significant increase to security, including a weapons screening process not typically in place for regular board meetings.[15] Defendant also issued another Community Message on October 8, 2025[16] acknowledging the potential for disruption and reminding the community of expectations on decorum.

The School Board convened on October 9, 2025. At the outset of the meeting,

---

[12] October 9, 2025 School Board Meeting Recording, Superintendent statement, minute 8:00, https://www.k12albemarle.org/school-board/school-board-meeting-videos.
[13] https://www.k12albemarle.org/our-departments/communications/message-board/~board/community-messages/post/a-message-to-our-acps-community-100325
[14] https://esb.k12albemarle.org/com/agenda_list.aspx
[15] https://www.k12albemarle.org/our-departments/communications/message-board/~board/community-messages/post/what-to-expect-at-tonights-school-board-meeting
[16] https://www.k12albemarle.org/our-departments/communications/message-board/~board/community-messages/post/what-to-expect-at-tonights-school-board-meeting

Superintendent Matt Haas delivered prepared remarks explaining Defendant's decision to permit the Event.[17] He asserted that federal and constitutional law required Defendant to permit the Event.

Board Member, Allison Spillman, also delivered prepared remarks[18] in response to backlash that she faced when she spoke out publicly against the Event. Ms. Spillman remarked that since speaking out against the Event on social media, she was subjected to a coordinated campaign of harassment and intimidation, which was terrifying. Ms. Spillman shared that she had received thousands of messages through various manners of communication full of assaults, harassment and statements containing threats against her family, her children, and other students at WAHS.

<u>Plaintiff</u>

Plaintiff is a nonbinary[19] student enrolled in and attending an Albemarle County Public Schools high school. Exhibit 2 – Plaintiff Declaration; Exhibit 15. For as long as Plaintiff can remember, they have felt feelings of gender dysphoria and discomfort with their biological sex. *Id*. That dysphoria and discomfort worsened as they became an adolescent. *Id*.

During their ninth-grade year, Plaintiff came out as nonbinary and began using the pronouns "they/them," although they have been misgendered by other students, and at least one teacher, on many occasions. *Id*. Other gender diverse students at Western Albemarle High School also have similar, if not worse, experiences. *Id*.

---

[17] October 9, 2025 School Board Meeting Recording, Superintendent statement, minute 8:00, https://www.k12albemarle.org/school-board/school-board-meeting-videos.
[18] October 9, 2025 School Board Meeting Recording, Spillman statement, minute 24:35, https://www.k12albemarle.org/school-board/school-board-meeting-videos.
[19] J. Doe uses "they/them" pronouns.

Plaintiff's experience with gender dysphoria has led to significant symptoms of anxiety. *Id*. While they have developed strong coping skills, the symptoms of gender dysphoria and anxiety are like background noise that make everything in their life more difficult. *Id*. It is like an extra thing that they always worry about and try to push aside in order to get through the day. *Id*. It is challenging to focus and devote their energy to academic and extracurricular demands with that constant noise. *Id*. Knowing that there are people around them who deny their existence is a weight that Plaintiff carries with them everywhere. *Id*. Plaintiff feels demoralized to know that there are adults and peers going out of their way to make Plaintiff's life more difficult. *Id*.

When Plaintiff learned about the Event, they were shocked and disappointed. *Id*. Until that point, Plaintiff had generally felt that WAHS was a supportive environment. *Id*. While Plaintiff knew there were a subset of students and teachers who denied their identity and existence, Plaintiff believed that Defendant would protect transgender and gender diverse students from hate and discrimination. *Id*. Plaintiff is disappointed that Defendant sanctioned this event rather than protecting Plaintiff and their peers from this discriminatory speech. *Id*. Plaintiff is disappointed that the Club is comfortable with this escalation in its rhetoric against individuals based on their identity. *Id*. While the Club has previously invited speakers who espoused beliefs that Plaintiff disagreed with, this is the first event that targeted a specific group of individuals. *Id*. As a result, the background noise that permeates every aspect of Plaintiff's life is now louder. *Id*. With this escalation, it has become more difficult to manage the weight that Plaintiff carries. *Id*.

While Plaintiff can choose not to attend the event, Plaintiff cannot avoid its promotion. *Id*. The Club, and its sponsor teacher, have hung posters advertising the event

throughout the school. *Id*.; Exhibit 14 – Event Poster. It is impossible to avoid them. *Id*.
Each poster prominently displays the title "Two Genders, One Truth." *Id*. This is a constant
reminder of the ignorance and hate to be espoused, making it even more difficult for
Plaintiff to go to school and focus on academic and extracurricular activities. *Id*.

In addition to knowing that there are multiple members of the Club who have a
discriminatory view of Plaintiff's existence, Plaintiff also knows that some students will be
drawn to this event simply by the promise of free pizza and the potential for winning raffle
prizes. *Id*. The Club routinely offers pizza and prizes as an enticement to encourage students
to attend. *Id*. As a result, many students attend even if they are not particularly interested in
the topic at hand, particularly younger students. *Id*. These students may be swayed by the
inherently false information promoted by the event and will in turn adopt these
discriminatory opinions. *Id*. This can be reasonably anticipated to make the environment at
Western Albemarle High School more hostile to transgender and gender diverse students. *Id*.

In addition to numerous public comments shared with Defendant as to the dangers
that discriminatory speech like this poses for the school community, Plaintiff's counsel also
sent a lengthy memo to Defendant outlining the factual and legal basis for Plaintiff's claims,
putting Defendant on notice that they would be in violation of the law if the Event was
permitted to continue. Exhibit 3 - Preview Memo. That memo was summarily dismissed by
Defendant's counsel. Exhibit 4 - Emails.

Transgender and Gender Diverse Students

The United States Court of Appeals for the Fourth Circuit addressed questions relevant to
the rights of gender diverse students in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir.
2020). As a basis for that decision, the Fourth Circuit confirmed the following truths as a matter

of fact:

> Just like being cisgender, being transgender is natural and is not a choice. Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities. However, transgender people face major mental health disparities: they are up to three times more likely to report or be diagnosed with a mental health disorder as the general population, and nearly *nine times* more likely to attempt suicide than the general population.

> Moreover, many transgender people are clinically diagnosed with gender dysphoria, "a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." Puberty is a particularly difficult time for transgender children, who often experience intensified gender dysphoria and worsening mental health as their bodies diverge further from their gender identity. Left untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide. Being subjected to prejudice and discrimination exacerbates these negative health outcomes.

> Transgender students face unique challenges in the school setting. In the largest nationwide study of transgender discrimination, the 2015 U.S. Transgender Survey, 77% of respondents who were known or perceived as transgender in their K-12 schools reported harassment by students, teachers, or staff. For such students who were known or perceived to be transgender:

> - 54% reported verbal harassment;
> - 52% reported that they were not allowed to dress in a way expressing their gender;
> - 24% reported being physically attacked because people thought they were transgender;
> - 20% believed they were disciplined more harshly because teachers or staff thought they were transgender;
> - 13% reported being sexually assaulted because people thought they were transgender; and
> - 17% reported having left a school due to severe mistreatment.

> Unsurprisingly, then, harassment of transgender students is also correlated with academic success: students who experienced greater harassment had significantly lower grade point averages. And harassment at school is similarly correlated with mental health outcomes for transgender students. The opposite is also true, though: transgender students have better mental health outcomes when their gender identity is affirmed.

*Id.* at 594-97 (internal quotations, citations and parentheticals omitted); *see also* Exhibit 5

(American Psychological Association Guidelines), Exhibit 6 (U.S. Transgender Survey Report),

Exhibit 7 (American Psychological Association Position Statement), Exhibit 8 (Expert Report),

Exhibit 12 (SOC 8), relied on by the Fourth Circuit.

## ARGUMENT

### I.    Standard of Review

Federal Rule of Civil Procedure 65(b) authorizes a district court, in limited

circumstances, to issue a temporary restraining order without written or oral notice to adverse

parties or their attorneys. Fed. R. Civ. P. 65(b)(1). "[A] temporary restraining order is intended to

preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil*

*Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999); see *Granny Goose Foods, Inc.*

*v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439

(1974).

A party seeking a temporary restraining order under Rule 65(b) must satisfy two

threshold requirements. First, the movant must point to "specific facts in an affidavit or a verified

complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to

the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

Second, the "movant's attorney [must] certif[y] in writing any efforts made to give notice and the

reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).

In addition, the party requesting a temporary restraining order must show that the four

preliminary-injunction factors favor injunctive relief. *See Mogensen v. Welch*, 707 F. Supp. 3d

604, 609 (W.D. Va. 2023). They must demonstrate (1) by a "clear showing" that they are likely

to succeed on the merits; (2) that they are likely to suffer irreparable harm without preliminary

relief; (3) that the balance of equities tips in their favor; and (4) that preliminary relief is in the

public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The third and fourth factors "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

II.    <u>Plaintiff Has Satisfied the Two Threshold Requirements</u>

a. *Plaintiff has shown that they will suffer irreparable harm in the absence of immediate injunctive relief.*

There is a presumption of an irreparable injury when a plaintiff has shown a "violat[ion] [of] a civil rights statute." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir.2001). Thus, Plaintiff can show irreparable injury simply because their Title IX claim is likely to succeed on the merits as discussed below.

Moreover, Plaintiff has already suffered, and will continue to suffer, irreparable harm in the absence of immediate injunctive relief. The Event is scheduled to take place at lunchtime on November 19, 2025. Without immediate injunctive relief, Defendant has made it clear that it will permit the Event to proceed as planned. While Plaintiff has already suffered from the approval and promotion of the Event, that harm will be cemented if the Event proceeds. The stigma already felt by Plaintiff is now exacerbated by Defendant's approval of the Event. Plaintiff was already cognizant that there were members of the school community who saw them as deviant, deluded or worse, but now Plaintiff cannot move through the educational environment without the constant reminder of posters promoting the Event hung throughout the school. This constant reminder, along with the fact that school officials sanctioned this Event despite knowing the result, has reinforced a feeling of inferiority that is perpetuated upon transgender and gender diverse students.

Discriminatory language like Victoria Cobb's "Two Genders: One Truth"

presentation has significant negative effects on transgender students. The inferiority

reinforced by discriminatory language can severely hamper students' ability to learn

effectively and even inhibit their willingness to attend school in the first place.

Discriminatory language often leads to physical harm, as transgender and gender diverse

students are subject to violence at school at a far higher rate than other students. Transgender

students also consider suicide, make suicide plans, and attempt suicide at far higher rates

than other students. *See* Exhibit 13 at 54 (the negative effects of rejection from peers and

school continue into adulthood).

    b.  *Plaintiffs' counsel has certified in writing the efforts made to give Defendant notice.*

  Defendant has been on notice since at least October 9, 2025[20] that permitting the Event

was a violation of its own policies and federal law. That notice was made even more clear when

Plaintiff's counsel sent a preview memo to Defendant outlining the relevant legal and factual

authority. Exhibit 3. Despite efforts to engage Defendant prior to litigation, Defendant dismissed

these concerns outright. Exhibit 4.

  Prior to and at the time of filing, Plaintiff also made efforts to notify Defendant's counsel

of the filing of the Complaint and request for temporary restraining order ("TRO") to be filed

with the Court. Exhibit 16 – Declaration of Lauren Baum. Given that the Event is scheduled to

take place on November 19, 2025 without the Court's intervention, immediate action is

necessary even without notice to Defendant. Defendant had a chance to do the right thing and

chose not to. Defendant's defense of its decision to permit the Event is a matter of public record,

delivered by the Superintendent at the October 9, 2025 board meeting. Plaintiff has responded to

---

[20] October 9, 2025 School Board Meeting Recording, Lauren Baum public comment, minute 1:24:44, https://www.k12albemarle.org/school-board/school-board-meeting-videos.

that defense below so that the Court can consider it before ruling.

III.    Plaintiff Has Satisfied the *Winter* Factors

    a.  *Plaintiff has established a likelihood of success on the merits of their Title IX claim.*

        i.  *The evidence establishes a likelihood that Plaintiff can demonstrate the elements necessary to establish liability under Title IX.*

Plaintiff has made a clear showing that they are likely to succeed on the merits of their Title IX claim. Title IX provides the following: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2012). A school district that acts in a manner that is deliberately indifferent to discriminatory speech that will "cause [students] to undergo" harassment or "make them liable or vulnerable" to such speech, will be liable for damages under Title IX. *See Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999); *see e.g.*, *Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484, 491–92 (4th Cir. 2025).

"[I]n order to succeed on a Title IX claim premised on sexual harassment, a plaintiff must show that: (1) the educational institution receives federal funds[21]; (2) the plaintiff was subjected to harassment based on [their] sex; (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) there is a basis for imputing liability to the institution. *Blair*, 147 F.4th at 492 (quoting *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018)). "A school must engage in efforts that are reasonably calculated to end the harassment." *Id*. (quoting

---

[21] This element is not in dispute.

*Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 523 (4th Cir. 2025)). Thus, liability arises where the school's response or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 630.

There can be no dispute that the discriminatory speech in question falls within the purview of Title IX, which extends to discrimination based on gender identity. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020). Courts have held that gender stereotyping, where a plaintiff is mistreated for failing to conform to sex stereotypes, is another method for proving that same-sex harassment is based on sex. *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012); *Medina v. Income Support Div.,* 413 F.3d 1131, 1135 (10th Cir. 2005).

The discriminatory speech that will be promoted at the Event is so severe, pervasive and objectively offensive that it already has caused, and will to a greater extent following the Event cause, a hostile environment and have a concrete, negative effect on Plaintiff's ability to participate in school activities. While Plaintiff has managed to succeed in school, they have been forced to carry a heavier load than their gender conforming peers because of discrimination, which is exacerbated by the Event. Exhibit 2. The discriminatory speech has already, and will continue to, undermine and detract from Plaintiff's educational experience, such that Plaintiff has been and will continue to be denied equal access to educational opportunities.

Severe means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass. *Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613, 620-21 (6th Cir. 2019). The discriminatory speech in question goes beyond juvenile teasing and name calling. Rather, the Event is a coordinated effort by

students and the adults involved to deny and attack the very identity of transgender and gender diverse people, including Plaintiff.

"Whether gender-oriented conduct rises to the level of actionable harassment [ ] depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved. The number of students involved is a reasonable way to measure the severity of the harassment. *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 227 (D. Conn. 2006). When that number is higher and the harassment happens in the open, the conduct should be considered severe. *Id*. This is true even if the Title IX claim is based on verbal harassment alone. *See Doe v. Plymouth-Canton Cmty. Sch*., 2022 WL 17858955 at *8 (E.D. Mich. June 3, 2022) ("it is possible to assert a Title IX claim based exclusively on verbal harassment").

Given the public outcry in opposition to the Event, and Principal Sublette's initial decision to restrict it, it is clear that the discriminatory speech planned is offensive to a reasonable person under the circumstances, not merely offensive to Plaintiff, personally or subjectively. *See Kollaritsch*, 944 F.3d at 621 (citing *Davis*, 526 U.S. at 652, 119 S.Ct. 1661). Finally, given how widespread conversations about and promotion of the Event have become, it is clearly pervasive. *See Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 227 (D. Conn. 2006). The Event has garnered significant attention and is currently promoted throughout the school building, making it impossible for Plaintiff to avoid.

The evidence thus demonstrates that the discriminatory speech at issue is severe, pervasive and objectively offensive to the point that it has already and will continue to undermine and detract from Plaintiff's experience, thus denying Plaintiff equal access to

educational resources and opportunities. *See Davis*, 526 U.S. at 651, 119 S.Ct. 1661. An evidentiary link between the harassment and access to educational services, balanced with the persistence and severity of harassment, can work to establish a disadvantaged learning environment for the victim. *Davis*, 526 U.S. at 652, 119 S.Ct. 1661. In this case, the impact of discrimination permeates every aspect of Plaintiff's life, when they describe as constant background noise that makes focusing on educational activities more difficult.

Discriminatory language like Victoria Cobb's "Two Genders, One Truth" have already been shown to have significant, long-lasting, negative effects. The Event and its promotion (already underway) amounts to public stigmatization through a forum of condescension. Such stigma, prejudice and discrimination is proven to have negative effects on the health and well-being of transgender and gender diverse people. Exhibit 5 at 7; Exhibit 6 at 137 (negative school experiences are correlated with a variety of poor outcomes, such as higher ratees of attempted suicide, homelessness, and serious psychological distress); Exhibit 7 (discrimination and lack of equal civil rights are damaging to the mental health of transgender and gender diverse people); Exhibit 13 at 54 (rejection by peers and school staff is strongly linked to negative outcomes, such as anxiety, depression, suicidal ideation, suicide attempts and substance abuse). The Event is clearly going to be harmful to transgender and gender diverse students.

Finally, because Defendant knows about the risk of harm that the Event poses to Plaintiff and other students and has decided to sanction the Event anyway, Plaintiff is likely to succeed in imputing liability to Defendant. There can be no dispute that school officials with authority to stop the Event have knowledge of the discriminatory speech planned and have expressly authorized it to proceed. Given the knowledge that Defendant has about the

Event and the impact that discriminatory speech has on transgender and gender diverse

students, Defendant's decision to permit the Event will cause students to undergo

harassment or make them more vulnerable to it, making Defendant's response clearly

unreasonable and therefore deliberately indifferent.

> ii. *Defendant's First Amendment defense is unavailing.*

Defendant's anticipated defense of its decision to permit the Event is that Federal[22] and

constitutional law requires it to do so. That contention simply is not true. Federal courts have

consistently recognized that public school students' First Amendment rights are "not coextensive

to those held by others in other contexts," as "most public school students are minors and school

administrators have the duty to provide and facilitate education and to maintain order and

discipline." *Newsom v. Albemarle County Sch. Bd*., 354 F.3d 249, 255 (4th Cir.2003) (citations

omitted).  The Supreme Court and others have recognized numerous circumstances where a

school may restrict speech without running afoul of the First Amendment. Courts have

established that the First Amendment does not give groups or speakers carte blanche to promote

ignorance, prejudice and hate through harmful, discriminatory speech.

The Event falls clearly and squarely within the same line of circumstances and therefore

can absolutely be prohibited. The First Amendment does permit free reign for student clubs to

arrange and promote any speech (of any content) by any third-party speaker. Several Supreme

Court cases establish the framework within which to evaluate the First Amendment claims of

public-school students.  The common theme among these cases is that First Amendment rights of

---

[22] The Equal Access Act expressly allows restriction if the meeting in question materially and substantially interferes with the orderly conduct of educational activities within the school, to protect the well-being of students and faculty, and that is otherwise unlawful. 20 U.S.C.A. § 4071. Thus, the First Amendment analysis presented also applies to any Equal Access Act analysis.

expression must comport with the ability of school officials to carry out the educational mission. *See Saxe v. State Coll. Area Sch. Dist*., 240 F.3d 200, 217 (3rd Cir. 2001) ("The primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school environment.").

In *Tinker v. Des Moines Independent Community School District*, the Supreme Court recognized that the First Amendment must be applied in light of the special circumstances of the school environment, balancing the individual students' rights with the rights of the school to maintain order. 393 U.S. 503, 506 (1969). Even the Club's attorney acknowledged that *Tinker* established that schools may regulate speech that is reasonably anticipated to cause a material and substantial disruption or interfere with the rights of others. *See id*.at 513. But, unlike the silent, passive expression in *Tinker*, the Event will undoubtedly cause a material and substantial disruption and interfere with the rights of others.

The Supreme Court in *Mahanoy Area Schl. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188 (2021), extended the *Tinker* standard to "serious or severe bullying or harassment", making it clear that schools may restrict such speech because it invades the rights of others. In recognizing that "these concepts are not easy to define with the precision required for a regulation of speech", the Supreme Court in *Mahanoy* homed in on "speech that criticizes or derides particular individuals." *Id*. at 209.

The Event is undoubtedly going to criticize and deride gender diverse individuals. Inherent in the title "Two Genders: One Truth" is ridicule, harassment, and an attack on the very identities of gender diverse students. Defendant was easily able to recognize this potential derision when it decided to restrict the Event in the first place. Defendant is empowered to prevent such actions and must act accordingly.

In another seminal First Amendment case, the Supreme Court in *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988), established that schools may regulate school-sponsored speech on the basis of any legitimate pedagogical concern.  There, the Supreme Court stated that "school[s] need not tolerate student speech that is inconsistent with its basic educational mission."  *Id.*

Thus, Defendant also has the authority to restrict the speech at hand based on legitimate pedagogical concerns. The Event will undoubtedly contain factually incorrect information about sex and gender, in contradiction to accepted scientific understanding.  The speech is also clearly inconsistent with the Defendant's educational mission of providing a safe and supportive educational environment for gender diverse students.

At bottom, schools have considerable discretion to restrict speech to maintain order and discipline, protect students from harassment, and otherwise pursue their educational mission. Defendant is remiss in not using its discretion to protect students from this discriminatory speech and the hostile environment that it will cause.

Defendant's existing policies demonstrate that Defendant is aware of its ability to restrict speech, as needed, to provide and facilitate education and to maintain order and discipline. Defendant already has policies that restrict speech on this basis, consistent with Federal jurisprudence on this issue.

Defendant's Student Conduct/Standards of Student Conduct Policy ("Code of Conduct") prohibits, among other things, the following behaviors that constitute speech/expression: bullying; harassment; threats/intimidation; and use of profane or obscene language. Exhibit 9. The Code of Conduct similarly includes restrictions on student dress and displays on several bases, including but not limited to, clothing and displays with "discriminatory" language or

images. *Id*.

Furthermore, as it relates to the dress code, Defendant has prohibited the following:

[C]lothing and displays that demean or promote harassment or hatred toward an identifiable person or group based on race, color, religion, ethnicity, national origin, ancestry, gender, gender identity, sexual orientation, or disability, including, but not limited to, Confederate imagery and other symbols of hate and oppression, such as the swastika, cause substantial disruption to the educational environment and, therefore, are prohibited.

*Id*.

Defendant's Student Publication Policy restricts, among other things, student expression if it is defamatory; is reasonably foreseeable to lead to the substantial disruption of school activities or to endanger the health or safety of students or staff; or advocates prejudice, hatred, violence, or harassment on the basis of protected classes. Exhibit 10. Defendant's Distribution of Materials by School-Sponsored Organizations Policy restricts, among other things, distribution or display of communication that would promote illegal discrimination on the basis of protected classes; defame a person; or threaten serious disruption of or material interference with a school or school-sponsored activity. Exhibit 11.

In total, Defendant's policies inherently recognize that a school can restrict student speech when it is reasonably anticipated to cause a material and substantial disruption or interferes with the rights of others. The Event will endanger the health and safety of gender diverse individuals, encourage harassment and prejudice, and create a hostile environment.

Permitting the Event is also antithetical to the purpose and intent of Defendant's Policy on the Treatment of Transgender and Gender-Expansive Students ("Transgender Student Policy"), which was purportedly adopted to:

[M]aintain a safe and supportive school environment for all students free from harassment, intimidation, and/or bullying and free from discrimination because of actual or perceived race, color, creed, ethnicity, national origin, citizenship/immigration status, religion, biological sex, gender identity, gender expression, sexual orientation, disability,

age, marital status, pregnancy, childbirth or related medical conditions, or any other
protected class…

Exhibit 12. The stated intent of the Transgender Student Policy is to keep the "learning

environments safe and free from discrimination and harassment." The Transgender Student

Policy explicitly cites the unique challenges that gender-expansive students face at school as the

reason for the policy.  The Event directly conflicts with Defendant's educational mission, which

underlies this policy.

To be clear, the Event is not just promoting an unpopular or contrary viewpoint. Rather, it

is speech that directly targets individuals on account of their identity. This is what Professor

Emily Gold Waldman calls "verbal bullying," Emily Gold Waldman, A Post-Morse Framework

For Students' Potentially Hurtful Speech (Religious and Otherwise), 37 J.L. & Educ. 463, 492–

96 (2008).

To avoid any doubt, look to the United States Court of Appeals for the First Circuit's

decision in *L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854, 864 (1st Cir. 2024),

cert. denied sub nom. *L. M. by & through Morrison v. Town of Middleborough, Massachusetts*,

145 S. Ct. 1489 (2025). There, the First Circuit addressed a high school student's purported right

to wear a t-shirt that displayed "There Are Only Two Genders." The First Circuit concluded that

the school district could regulate expression, even when it is silent and passive and does not

target a particular student, if it is "reasonably interpreted to demean" a characteristic of personal

identity that is "unalterable or otherwise deeply rooted" and "strikes a person to the core of

[their] being." *Id*. at 870.

It is obvious that the Event will do just that. It will denigrate and debase the very identity

of gender diverse individuals, creating a hostile environment and having a lasting effect that can

never be undone. See Exhibit 13 at 54 (negative effects carry into adulthood).

   *b. An injunction is necessary to avoid irreparable harm.*

  "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp*., 952 F.2d 802, 812 (4th Cir. 1991)). An injury is irreparable when it "cannot be fully rectified by the final judgment after trial." *Id*. (citation omitted). If the Event is permitted to occur as planned, Plaintiffs face immediate, irreparable harm.

  There is a presumption of an irreparable injury when a plaintiff has shown a "violat[ion] [of] a civil rights statute." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir.2001). Thus, Plaintiff can show irreparable injury simply because their Title IX claim is likely to succeed on the merits as discussed above.

  As established above, Plaintiff has already suffered, and will continue to suffer, irreparable harm in the absence of immediate injunctive relief. Without the requested injunctive relief, the Event will proceed as planned at lunchtime on November 19, 2025. The harm and stigma already caused by discussion and promotion of the Event will be cemented once the Event occurs.

   *c. The balance of hardships weighs in favor of an injunction and an injunction is in the public interest.*

  The third and fourth preliminary injunction factors—assessing the harm to the opposing party and weighing the public interest—merge where, as here, the government is the opposing party. *Nken*, 556 U.S. at 435, 129 S.Ct. 1749. "[T]he overriding public interest lay[s] in the firm enforcement of Title IX." *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir.1993). When balancing hardships, it is clear that Plaintiff faces deeply personal,

irreparable harm without injunctive relief, while Defendant does not appear to face any irreparable harm from an injunction.

## CONCLUSION

The record evidence demonstrates that emergency injunctive relief is immediately required to protect Plaintiff and other transgender or gender diverse students from the irreparable harm to be caused by the Event. Thus, Plaintiff respectfully requests that the Court grant a temporary restraining order prohibiting Defendant from permitting the WAHS TPUSA club from hosting guest speaker, Victoria Cobb, and an event titled "Two Genders: One Truth" until this Court determines whether a longer preliminary injunction is warranted pending a final judgment on the merits.

Respectfully submitted,

/s/ *Alexis I. Tahinci*

Alexis I. Tahinci
VSB No. 85996
Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
Tel: (423) 406-1151
Fax: (423) 815-1728
alexis@tahincilaw.com


Lauren E. Baum, Esq.
Law Office of Lauren E. Baum, PC
240 W Main St
Suite 100 - V32
Charlottesville, VA 22902
202-450-1396
l.baum@laurenebaumlaw.com
*Application for admission pro hac vice pending*