**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **J. DOE,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 3:25-CV-00094** |
| **ALBEMARLE COUNTY SCHOOL BOARD** | |
| **Defendant.** | |

# AMENDED COMPLAINT

1. Defendant's decision to permit the Western Albemarle High School ("WAHS") Turning Point USA ("TPUSA") club (the "Club") to host and promote an event titled "Two Genders: One Truth" (the "Event") violates Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a).

2. Defendant was aware when it authorized the Event that the Event was reasonably anticipated to result in discrimination against transgender and gender diverse[1] students. Defendant was aware that its decision to permit the Event and the Event's promotion would cause those students to undergo harassment or make them vulnerable to it. Defendant's decision to permit the Club to proceed with and promote the Event is contrary to its own policies and deliberately indifferent to the rights and harm that the Event and its promotion would cause to transgender and gender diverse students.

[1] This term describes members of the many varied communities of individuals with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. See World Professional Association for Transgender Health's (WPATH) Standards of Care—Eighth Edition (SOC-8), https://doi.org/10.1080/26895269.2022.2100644 (9/15/22).

## JURISDICTION AND VENUE

3. This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. This Court has jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. § 1331. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

4. Venue lies with this Court pursuant to 28 U.S.C. §§ 1391(b)(1)-(2), because the defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

5. J. Doe is a nonbinary[2] student enrolled in and attending an Albemarle County Public Schools high school.

6. The Albemarle County School Board (the "School Board" or "Board") is an elected body responsible for the operation of the Albemarle County Public Schools ("ACPS"), including the promulgation of policies. At all times relevant, the School Board has acted and continues to act under color of state law.

## FACTUAL ALLEGATIONS

Transgender youth and gender dysphoria

7. Everyone has a gender identity. It is an established medical concept, referring to a person's deeply felt, inherent sense of one's gender. Most people have a gender identity that matches the sex they are identified as at birth. But people who are transgender have a gender identity that differs from the sex they are assigned at birth.

---

[2] J. Doe uses "they/them" pronouns.

8. Just like being cisgender, being transgender or gender diverse is natural and is not a choice.

9. Studies suggest that the prevalence of gender diversity among adolescents is higher than earlier thought, suggesting that gender diversity in youth should no longer be viewed as rare.

10. For many gender diverse youth, adolescence is a critical period for the development of gender identity.

11. Being transgender or gender diverse is not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities. However, transgender and gender diverse people face major mental health disparities: they are up to three times more likely to report or be diagnosed with a mental health disorder as the general population, and nearly nine times more likely to attempt suicide than the general population. These elevated rates of mental health disorders have been linked to complex trauma, societal stigma, violence, and discrimination.

12. Moreover, many transgender people are clinically diagnosed with gender dysphoria, a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex.

13. Transgender students face unique challenges in the school setting.

14. In the largest nationwide study of transgender discrimination available at the time, the 2015 U.S. Transgender Survey, 77% of respondents who were known or perceived as transgender in their K-12 schools reported harassment by students, teachers, or staff. For such students who were known or perceived to be transgender:

   - 54% reported verbal harassment;

- 52% reported that they were not allowed to dress in a way expressing their gender;
- 24% reported being physically attacked because people thought they were transgender;
- 20% believed they were disciplined more harshly because teachers or staff thought they were transgender;
- 13% reported being sexually assaulted because people thought they were transgender; and
- 17% reported having left a school due to severe mistreatment.

15. Puberty is a particularly difficult time for transgender children, who often experience intensified gender dysphoria and worsening mental health as their bodies diverge further from their gender identity. Left untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide.

16. Being subjected to prejudice and discrimination exacerbates these negative health outcomes.

17. Multiple studies and expert consensus demonstrate that acceptance and affirmation of transgender and gender diverse youth are associated with fewer negative mental health and behavioral symptoms and more positive mental health and behavioral functioning. Psychiatric symptoms lessen with interventions that reduce discrimination.

18. Rejection by peers and school staff (e.g., intentionally using the name and pronoun the youth does not identify with, not acknowledging affirmed gender identity, bullying, harassment, verbal and physical abuse, poor relationships, rejection) is strongly linked to negative outcomes, such as anxiety, depression, suicidal ideation, suicide attempts, and substance use. These negative outcomes continue into adulthood. Transgender and gender diverse youth often internalize rejection from peers as well as the transphobia that surrounds them, which can be impactful across their lifespan.

19. Even neutral or indifferent responses to a youth's gender diversity have been found to have negative consequences.

20. Harassment of transgender students is also inversely correlated with academic success: students who experienced greater harassment had significantly lower grade point averages.

21. Harassment at school is similarly correlated with negative mental health outcomes for transgender students. The opposite is also true, though: transgender students have better mental health outcomes when their gender identity is affirmed.

22. Recently, experts warned that the United States is in the early stages of genocide against transgender Americans.

23. Some secular or religious organizations, such as the Family Foundation of Virginia, undertake efforts to thwart an adolescent's expression of gender diversity or assertion of a gender identity other than the expression and behavior that confirms to the sex assigned at birth. These disaffirming behaviors are associated with increases in mental illness and poorer psychological functioning.

<u>School Division Policy</u>

24. Defendant has adopted numerous policies that limit student and staff speech/expression with the purpose of protecting students from discrimination. Defendant has various policies in place that prohibit speech and conduct that are discriminatory or harmful to others. Defendant's decision to permit the Event and its promotion is contrary to those policies.

25. Defendant's Equal Educational Opportunities Policy and Nondiscrimination Policy expressly prohibits discrimination against students on the basis of sex, gender, and gender

identity, among other things. These policies also affirm Defendant's duty and commitment to provide an educational climate in all schools free from discrimination of all kinds, including, but not limited to, discrimination on the basis of sex, gender, and gender identity.

26. Defendant's Prohibition Against Harassment and Retaliation Policy states that it is a violation of that policy for any student or school personnel to harass a student based on protected group status. It is also a violation of that policy for any school personnel to tolerate harassment based on a student's protected group status at school or any school sponsored activity, by students, school personnel or third parties participating in, observing or otherwise engaged in school sponsored activities.

27. Defendant's Prohibition Against Harassment and Retaliation Policy also prohibits harassment that may not otherwise be illegal:

> Behavior that is not unlawful or does not rise to the level of illegal harassment or retaliation may nevertheless be unacceptable for the educational environment or the workplace. Demeaning or otherwise harmful actions are prohibited, particularly if directed at personal characteristics including, but not limited to, socioeconomic level, sexual orientation, perceived sexual orientation, gender identity or gender expression, regardless of whether the personal characteristic is protected by law.

28. Defendant's Student Conduct Policy was adopted to maintain an atmosphere free of disruption and threat to persons or property and supportive of individual rights. The Student Conduct Policy states "Every student has a right to a quality education in an environment that is conducive to learning and free of disruption. Conversely, every student has the responsibility not to deny that right to others."

29. The Student Conduct Policy prohibits any conduct, clothing or displays "that demean or promote harassment or hatred toward an identifiable person or group based on race,

color, religion, ethnicity, national origin, ancestry, gender, gender identity, sexual orientation, or disability, including, but not limited to, Confederate imagery and other symbols of hate and oppression, such as the swastika, cause substantial disruption to the educational environment and, therefore, are prohibited."

30. Defendant's Employee Standards of Conduct Policy requires all employees to comply with all of Defendant's policies and prohibits use of an employee's work time, environment, position, access, or property to promote a political candidate or controversial issue.

31. Defendant's Political Activities Policy prohibits employees from using their position, employment status, or access within the School Division to further a political cause.

32. Defendant's Distribution of Materials by School-Sponsored or Governmental Organizations Policy governs the distribution of materials and promotion of programs, activities, and events by clubs sponsored by or affiliated with ACPS, among others. That Policy prohibits ACPS from distributing or displaying communications from any organization that would: endorse or encourage any violation of the Student Conduct Policy; cause ACPS to violate state or federal laws or its policies; or promote illegal discrimination; among other things.

33. Defendant's Policy on the Treatment of Transgender and Gender-Expansive Students was adopted to maintain a safe and supportive school environment for all students free from harassment, intimidation, and/or bullying and free from discrimination because of actual or perceived biological sex, gender identity, and gender expression, among other protected characteristics.

34. The Policy on the Treatment of Transgender and Gender-Expansive Students expressly acknowledges the unique challenges that transgender and gender-expansive students face at school, which is what led Defendant to adopt it.

35. The Policy on the Treatment of Transgender and Gender-Expansive Students concedes that Defendant had knowledge of the particular vulnerabilities that transgender and gender-expansive students face and the resulting potential for discrimination and harassment at school.

36. The Policy on the Treatment of Transgender and Gender-Expansive Students requires that schools be vigilant about harassment of transgender and gender-expansive students and address such concerns promptly and thoroughly.

37. Defendant's decision to permit the Club to host and promote the Event violates all these policies.

<u>The Club and Event</u>

37. The Club was founded in late 2024 with the support of faculty sponsor, Michelle Karpovich.

38. In January 2025, the Club began recruiting members using national promotion kits provided by Turning Point USA as well as financial support and direction from individuals outside of the school who funded giveaways such as donuts, pizza, gift cards, and other items.

39. As part of this recruitment, the Club was permitted by Defendant to distribute buttons displaying "My Pronouns are Patriot."

40. In October 2025, members of the Club initiated a petition to keep transgender girls out of the girls' bathrooms at WAHS.

41. The Club claims to be bipartisan but speakers have exclusively included Republican politicians and conservative activists/influencers.

42. Since the Club's formation, there has been an increase in hate-bias incidents across Albemarle County public schools.

43. The Club has hosted outside speakers in the past, addressing controversial topics such as abortion and immigration, among others. On at least one occasion, the speaker and lunch-time event ran over the lunch period by nearly a half an hour. That event was held in the Club's sponsor teacher's classroom, where a class was scheduled to take place immediately following lunch. Students that arrived at that class were forced by the Club's sponsor teacher to listen to the speaker for nearly a half hour.

44. On or about September 25, 2025, WAHS Principal Jennifer Sublette received a flyer (pictured below) for the Event, which the Club had planned for October 1, 2025:




45. For the Event, the Club planned to host guest speaker Victoria Cobb, President of the Family Foundation (the "Speaker"), to give a presentation titled "Two Genders: One Truth."

46. The flyer for the Event prominently displayed the title "Two Genders: One Truth" in light blue, pink, and white, the primary colors associated with transgender identity. The title of

the Event and use of these colors to promote it was a clear affront to the identity of transgender students.

47. Family Foundation of Virginia is a socially conservative and Christian fundamentalist lobbying organization headquartered in Richmond, Virginia.

48. Victoria Cobb and the Family Foundation deny that sexual orientation and gender identity are immutable. They are opposed to same-sex marriage and advocate for policies denying the identities and rights of transgender and gender-expansive individuals.

49. Victoria Cobb's public comments are dismissive and hostile towards transgender and gender-expansive individuals. She routinely attacks gender-affirming efforts as harmful to society.

50. The title of Victoria Cobb's presentation, in and of itself, made it clear that the Event would demean and call into question the identities of transgender and gender-expansive individuals, cutting to their core and belittling their place in society. This Event and its promotion could reasonably be anticipated to serve to reinforce and emphasize a feeling of inferiority for transgender and gender-expansive students in a way that is unlikely to ever be undone.

51. The same day that she saw the Event flyer, Principal Sublette determined that it could not proceed as planned. As a result, she informed the Club that the event could not happen during the school day:

> Thank you for meeting with me today. During our meeting we discussed your club's plans to host Victoria Cobb from the Family Foundation on October 1 as a guest speaker on the topic "Two Genders One Truth" to quote from the flyer that was left in my mailbox before school this morning.
>
> During our time together, I pointed out that you and I had reviewed the club's plans for guest speakers at the start of the year and that this speaker had not been discussed at that time. I expressed my position that gender identity is a complex

> and controversial topic and that I wanted to support your club while also ensuring that hosting an open event focusing on this topic would not lead to a disruption to our instructional day. In addition to the mature content of this speaker, as you know our lunch period is 35 minutes long and we have previously had issues with special speaker events for TPUSA running over into the instructional block.
>
> My direction was that this club event would need to be offered after the school day. I offered open access to our building and supervision for students before and after the event given that our student activity bus runs at 6:45.
>
> Again, thank you for meeting with me. As I have shared with you before, I have appreciated that we have been able to work together to support your club activities and ensure students have access to the chapter you have created.

52. Principal Sublette was aware of and considered the potential for harm to transgender and gender-expansive students when she determined that the Event could not proceed as planned because it would result in disruption.

53. On September 26, 2025, the Founding Freedoms Law Center ("FFLC") sent a demand letter to School Division Counsel, Josiah Black. The demand letter, sent on behalf of the Club, its sponsoring teacher, Michelle Karpovich, and guest speaker Victoria Cobb, argued that the School Division was engaged in unlawful viewpoint discrimination.

54. On or about September 30, 2025, Superintendent Dr. Matthew Haas relented to legal pressure from FFLC and reversed Principal Sublette's decision to prohibit the Event from proceeding during the school day. In making this decision, Dr. Haas consulted with School Division Counsel, Josiah Black, but not the ACPS Board. The Board was not given an opportunity to deliberate or consider relevant law and policy before Dr. Haas and Mr. Black decided to permit the Event.

55. Not only did Dr. Haas and Mr. Black fail to consult with the Board, but Dr. Haas and Mr. Black also failed to consider existing ACPS policies when they decided to permit the Event and its promotion.

56. Discriminatory language like Victoria Cobb's "Two Genders: One Truth" presentation has significant negative effects on transgender students. The inferiority reinforced by discriminatory language can severely hamper students' ability to learn effectively and even inhibit their willingness to attend school in the first place. Discriminatory language often leads to physical harm, as transgender and gender-expansive students are subject to violence at school at a far higher rate than other students. Transgender students also consider suicide, make suicide plans, and attempt suicide at far higher rates than other students. Defendant was aware of these potential harms when it sanctioned the Event and its promotion.

57. On or about October 3, 2025, *after* significant community backlash regarding the Event, the School Division issued a Community Message signed by Dr. Matthew Haas (Superintendent), Dr. Kate Acuff (School Board Chair), and Dr. Rebecca Berlin (School Board Vice-Chair). The Community Message affirmed the School Division's commitment to the safety, well-being, and success of every student and acknowledged its responsibility to maintain a safe and respectful school environment, free from discrimination, regardless of background and identity. The Community Message also expressly acknowledged that the School Division's decision to permit the Event has left many feeling invalidated. Nevertheless, Defendant did not reverse Dr. Haas' decision to permit the Event and its promotion.

58. Defendant's next regular board meeting was scheduled for October 9, 2025. Anticipating a larger than usual turnout and substantial disruption resulting from the Event, Defendant arranged for a significant increase to security, including a weapons screening process not

typically in place for regular board meetings. Defendant also issued another Community Message on October 8, 2025 acknowledging the potential for disruption.

59. The School Board convened on October 9, 2025. The Event was not on the agenda, and the Board did not engage in any discussion or deliberation after public comment was provided. The decision to permit the Event and its promotion had already been made prior to this meeting, and Defendant never even considered reversing Dr. Haas' decision despite the concerns raised through public comment.

60. At the outset of the meeting, Superintendent Matt Haas delivered prepared remarks explaining Defendant's decision to permit the Event. He asserted that federal and constitutional law required Defendant to permit the Event. He also asserted that the Club's previous events/speakers had not posed any disruption, which was not accurate. The Club had previously hosted Congressman Bob Good in the Club's sponsor teacher's classroom during the lunch period. That event went past the time allotted for club meetings by nearly a half hour, and the Club's sponsor teacher forced students who reported for class in that room after lunch to sit through nearly a half hour of Mr. Good's remarks whether they wanted to or not.

61. Dr. Haas did not address any of the aforementioned policies in his remarks.

62. Board Member, Allison Spillman, also delivered prepared remarks in response to backlash that she faced when she spoke out publicly against the Event. Ms. Spillman remarked that since speaking out against the Event on social media, she was subjected to a coordinated campaign of harassment and intimidation, which was terrifying. Ms. Spillman shared that she had received thousands of messages through various manners of

communication full of assaults, harassment and statements containing threats against her family, her children, and other students at WAHS.

63. Numerous speakers gave public comment opposing the decision to permit the Event to proceed and informing Defendants of the harm that the Event will cause to transgender and gender diverse students.

64. On October 27, 2025, Plaintiff's counsel, before being retained by Plaintiff, also sent a lengthy memo to Defendant outlining the factual and legal basis for potential claims that could be raised by transgender students, putting Defendant on notice that they would be in violation of the law if the Event was permitted to continue. That memo was summarily dismissed by Defendant's counsel, Mr. Black, without any deliberation or consideration by Defendant.

65. Plaintiff engaged counsel on November 15, 2025 and filed suit on November 17, 2025, requesting a Temporary Restraining Order and Preliminary Injunction to bar the Event pending litigation.

66. A hearing on those requests was held on November 18, 2025. At that hearing, Defendant made material misrepresentations to the Court. Specifically, among those misrepresentations, Defendant represented that students planning to participate in the Event were required to sign up in advance and participation was capped at one hundred students.

67. Plaintiff's requests for a temporary restraining order and preliminary injunction were denied, and the Event was permitted to proceed on November 19, 2025.

68. Despite the representations made by Defendant at the hearing, there was no sign-up requirement for attendees, and over two hundred students[3] were allowed to attend.

69. There were no other efforts made by Defendant to minimize the impact of the Event and its promotion on transgender and gender diverse students.

70. Prior to the Event, Defendant permitted the Club to display posters promoting the Event throughout the school building. Those posters prominently displayed the title "Two Genders: One Truth." The Club, and its sponsor teacher, hung those posters throughout the school, making them impossible to avoid. The posters were hung the week before the Event on every wall in the building outside of classroom spaces. For five days it was impossible for Plaintiff to walk through the school building without passing multiple posters bearing the title "Two Genders: One Truth."

71. Defendant also permitted the Club to promote the Event for at least three days leading up to the Event on the morning announcements and through the daily bulletin. Plaintiff could not avoid hearing the Event's promotion in the morning announcements and reading about the Event's promotion in the daily bulletin.

72. The Club is not just run by students – it has at least one very active teacher sponsor who actively participates in the planning and promotion of Club events and the events themselves. The sponsor teacher has also traveled with Club members on multiple out-of-state trips, promoting, participating in and supervising those activities as well.

73. The Club is also significantly supported by non-school persons who fund and direct Club activities.

[3] The Club and Speaker boasted through social media and other forums that over 200 students attended the Event.

74. Rather than protecting transgender and gender diverse students, Defendant took pains to protect the Speaker and the Club from protests in opposition to the Event. Defendant barred students from protesting in the hallway outside of the Event. [redacted]

75. Defendant secured additional police/security to be present on campus for the Event, clearly anticipating a disruption to the school environment.

76. During the Event, the Speaker maintained that policies that allow transgender individuals to use the restrooms and/or locker rooms consistent with their gender identity posed a risk to safety. The Speaker further proffered that no policies should be driven by gender but rather should only be rooted in biological sex. The Speaker told students that individuals cannot transition genders and that this was a matter of basic biology. The Speaker also told students that anytime someone tries to cancel speech that they oppose, it means that they know their position is weak.

77. Students that entered the Event, even if they only went for the free pizza, were not allowed to leave the Event before it ended. The reason cited by the Club and school administrators for this rule was "security."

78. [redacted]

79. [redacted]

[redacted]

80. Following the Event, the Club and Speaker widely publicized the fact that the Event happened and doubled down on their stance that transgender identities are a lie. There were multiple images and videos from the Event posted online. The Speaker also posted commentary, videos and images online boasting about the Event.

81. On November 20, 2025, leaders of the Club appeared on a local radio show about the Event. The host and Club leaders took the position that Plaintiff and others opposed to the Event should have just kept their mouths shut and let the Event occur. Club leaders called Plaintiff's lawsuit "absolutely ridiculous" and asserted that Plaintiff is scared of the truth. Club leaders went on to maintain that biologically, there are only two sexes and therefore only two genders.

82. On social media and during the radio appearance, leaders of the Club mocked a WAHS science teacher who posed a question about the Speaker's science background and expertise during the Event.

83. On November 21, 2025, the Speaker appeared on that same radio show essentially delivering the same message.

84. Another ACPS high school, Albemarle High School ("AHS"), recently launched a Turning Point USA chapter. The chapter at AHS is being mentored and guided by the WAHS Club leaders. The first speaker hosted by the AHS chapter was Bob Good, also the first speaker hosted by the WAHS chapter. It is only a matter of time before the AHS chapter invites Victoria Cobb, or a similar speaker, to target and demean individuals on the basis of their gender identity.

85. Defendant's decision to permit the Event and its promotion has exposed students and staff to discriminatory speech, leaving both groups harmed and afraid to speak up.

<u>Plaintiff's Experience</u>

86. Plaintiff is an active student, participating and holding leadership roles in various extracurricular activities.
87. Plaintiff aspires to go to college.
88. For as long as Plaintiff can remember, they have felt feelings of gender dysphoria and discomfort with their biological sex. That dysphoria and discomfort worsened as they became an adolescent.
89. During their ninth-grade year, Plaintiff came out as nonbinary and began using the pronouns "they/them," although they have been misgendered by other students, and at least one teacher, on many occasions. Other gender diverse students at Western Albemarle High School also have similar, if not worse, experiences.
90. Plaintiff's experience with gender dysphoria has led to significant symptoms of anxiety. While they have developed strong coping skills, the symptoms of gender dysphoria and anxiety are like background noise that make everything in their life more difficult. It is like an extra thing that they always worry about and try to push aside in order to get through the day. It is challenging to focus and devote their energy to academic and extracurricular demands with that constant noise. Knowing that there are people around them who deny their existence is a weight that Plaintiff carries with them everywhere. Plaintiff feels demoralized to know that there are adults and peers going out of their way to make Plaintiff's life more difficult.

91. When Plaintiff learned about the Event, they were shocked and disappointed. Until that point, Plaintiff had generally felt that WAHS was a supportive environment. While Plaintiff knew there were a subset of students and teachers who denied their identity and existence, Plaintiff believed that Defendant would protect transgender and gender diverse students from hate and discrimination.

92. Plaintiff was disappointed that Defendant sanctioned this event rather than protecting Plaintiff and their peers from this discriminatory speech. Plaintiff no longer trusts that Defendant will take necessary steps to protect transgender students from discrimination and harassment.

93. Since the Event and its promotion were sanctioned by Defendant, Plaintiff has felt emotionally and intellectually drained. They have broken down sobbing, questioning why their gender identity – who they are – is offensive to others.

94. Plaintiff was disappointed that the Club was comfortable with this escalation in its rhetoric against individuals based on their identity. While the Club had invited speakers who espoused beliefs that Plaintiff disagreed with, this was the first event that targeted a specific group of individuals. As a result, the background noise that permeates every aspect of Plaintiff's life is now louder, making it more challenging to actively participate in school. With this escalation, it has become more difficult to manage the weight that Plaintiff carries. The Event and its promotion have taken an emotional toll on Plaintiff, forcing them to work even harder to actively participate in school programs and activities.

95. Plaintiff could not avoid the Event's promotion, which included posters and daily announcements, all prominently displaying the title "Two Genders, One Truth" – a constant reminder that the intent of the Event was to deny Plaintiff's very identity.

96. The promotion of the Event was an unavoidable and constant reminder of the ignorance and hate to be espoused, making it even more difficult for Plaintiff to go to school and focus on academic and extracurricular activities and having a concrete, negative effect on Plaintiff both emotionally and intellectually, and interfering with their ability to participate in school.

97. Since the Event became public in October, and even more since it was promoted and took place, Plaintiff has engaged less in class discussions out of fear for sharing their viewpoint around others who support the denial of their existence.

## COUNT I

Title IX of the Education Amendments of 1972
20 U.S.C. § 1681 et seq.

98. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

99. Albemarle County Public Schools and Western Albemarle High School are education programs receiving Federal financial assistance.

100. By giving permission for the Event to proceed and be promoted at WAHS, Defendant violated the rights of Plaintiff under Title IX.

101. Defendant knew that the Event and its promotion would include discriminatory language targeting the identities of transgender and gender diverse individuals.

102. Defendant knew that the Event and its promotion would create a hostile environment for transgender and gender diverse individuals.

103. Defendant knew that the Event and its promotion was intended to attack the place of transgender and gender diverse individuals in society.

104. Defendant knows that transgender students are already vulnerable and has adopted policies to prevent discrimination and harassment on the basis of gender and gender identity. However, Dr. Haas failed to consider these policies or consult with legal counsel knowledgeable about these issues when he decided, on the Board's behalf, to permit the Event and its promotion.

105. Defendant had an affirmative duty under Title IX to prevent the Event and its promotion because it was reasonably anticipated to result in discrimination against transgender and gender diverse students.

106. Defendant knew that by not preventing the Event and its promotion, it would make transgender and gender diverse students more vulnerable to discrimination and harassment.

107. Defendant's decision to permit the Event and its promotion was clearly unreasonable.

**REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A. A declaration that Defendant's decision to permit Victoria Cobb and the "Two Genders: One Truth" Event and its promotion at Western Albemarle High School

violated Plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*;

B. Compensatory damages in an amount determined by the Court;

C. A permanent injunction prohibiting Defendant from permitting speakers, events, displays, and other speech that materially and substantially disrupts the educational environment or infringes upon the rights of transgender and gender diverse individuals;

D. Plaintiffs' reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

E. Such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Lauren E. Baum*

Lauren E. Baum, Esq.
Law Office of Lauren E. Baum, PC
240 W Main St
Suite 100 - V32
Charlottesville, VA 22902
202-450-1396
l.baum@laurenebaumlaw.com
*Pro Hac Vice*

Alexis I. Tahinci
VSB No. 85996
Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
Tel: (423) 406-1151
Fax: (423) 815-1728
alexis@tahincilaw.com