**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **J. DOE** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **ALBEMARLE COUNTY SCHOOL BOARD** <br><br> **Defendant.** | **Civil Action No. 3:25-CV-00094** |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff[1] respectfully requests that the Court deny Defendant's Motion to Dismiss. Plaintiff's Amended Complaint states a plausible claim for relief and Defendant's assertions to the contrary are unconvincing. Plaintiff's Amended Complaint plausibly alleges that Defendant acted with deliberate indifference when it decided to permit the Western Albemarle High School ("WAHS") Turning Point USA ("TPUSA") club (the "Club") to host and promote an event titled "Two Genders: One Truth" (the "Event"), violating Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a).

## BACKGROUND

At issue in this case is Defendant's deliberate indifference to discriminatory speech that Defendant knew would result in discrimination against transgender and gender diverse students. ECF Doc. 34, ¶¶ 1-2. Defendant was aware of the Club's hostility towards transgender and gender diverse students even before the Event was proposed. ECF Doc. 34, ¶¶ 37-40. When the Club began recruiting members in January 2025, the Club distributed buttons displaying "My

[1] Plaintiff uses "they/them" pronouns. Plaintiff has already been misgendered in one filing by Victoria Cobb (ECF No. 37).

Pronouns are Patriot." ECF Doc. 34, ¶¶ 38-39. In October 2025, members of the Club initiated a petition to keep transgender girls out of the girls' bathrooms at the school. ECF Doc. 34, ¶ 40. Defendant was also aware that since the Club's formation, there has been an increase in hate-bias incidents across its schools. ECF Doc. 34, ¶ 42. Once Defendant received the Event flyer, which prominently displayed the title "Two Genders: One Truth" in light blue, pink, and white (the primary colors associated with transgender identity), there was no question that the Event and its promotion would be a clear attack on the identity of transgender and gender diverse students. ECF Doc 34, ¶¶ 44-46.

Not only did the flyer itself clearly deny the very identities of transgender and gender diverse students, but the chosen speaker also left no question what the aim of the Event was. ECF Doc 34, ¶¶ 47-49. Victoria Cobb (the "Speaker") is the President of the Family Foundation, which is a socially conservative and Christian fundamentalist lobbying organization headquartered in Richmond, Virginia. ECF Doc. 34, ¶¶ 45, 47. The Speaker and the Family Foundation deny that sexual orientation and gender identity are immutable. ECF Doc 34, ¶ 48. They are opposed to same-sex marriage and advocate for policies denying the identities and rights of transgender and gender diverse individuals. *Id*. The Speaker's public comments are dismissive and hostile towards transgender and gender diverse individuals. ECF Doc 34, ¶ 49. The Speaker also routinely attacks gender-affirming efforts as harmful to society. *Id*.

Not only did Defendant know that the Event and its promotion would target transgender and gender diverse individuals and expose them to discrimination, Defendant permitted the Event and its promotion in direct contradiction to numerous school division policies that Defendant adopted to protect students from discrimination. ECF Doc. 34, ¶¶ 24-37. Many of those policies specifically prohibited discrimination on the basis of gender and gender-identity,

including a comprehensive Policy on the Treatment of Transgender and Gender-Expansive Students. *Id*. That Policy expressly acknowledges the unique vulnerabilities that transgender and gender diverse students face at school and the resulting potential for discrimination and harassment. ECF Doc. 34, ¶¶ 34-36. This Policy and others in place at the time of Defendant's decision to permit the Event and its promotion expressly prohibit numerous forms of speech that are discriminatory or harmful to transgender or gender diverse students. *Id*.

Defendant also knew when it decided to permit the Event that such discriminatory language has significant negative effects on transgender and gender diverse students. ECF Doc 34, ¶ 56. The inferiority reinforced by discriminatory language can severely hamper students' ability to learn effectively and even inhibit their willingness to attend school in the first place. *Id*. Discriminatory language often leads to physical harm, as transgender and gender diverse students are subject to violence at school at a far higher rate than other students. *Id*. Transgender students also consider suicide, make suicide plans, and attempt suicide at far higher rates than other students. *Id*. These vulnerabilities are precisely why Defendant adopted a policy to protect transgender and gender diverse students from discrimination and harassment. ECF Doc 34, ¶ 35.

Unsurprisingly, a significant portion of the community, including one of Defendant's own board members, was outraged by Defendant's decision. ECF Doc 34, ¶ 57. Defendant attempted to save face by issuing community messages and statements addressing the community's outrage. ECF Doc 34, ¶¶ 57-63. Despite the outrage and feedback it received from community members[2], Defendant did not even consider changing its decision. ECF Doc 34, ¶¶ 57-64.

---

[2] Defendant goes out of its way to inform the Court that Plaintiff's counsel was among the community members who spoke out against Defendant's decision to permit the Event, noting that she concluded her remarks by stating she would help affected students sue Defendant. This information serves no legitimate purpose other than to cast Plaintiff's counsel in an unfavorable light. Plaintiff's counsel regrets the use of intemperate language, but she stands

Defendant's deliberate indifference was made even worse when it appeared before this Court and made material misrepresentations to the Court to suggest that Defendant was taking steps to mitigate the harm that the Event would cause to transgender and gender diverse students. ECF Doc 34, ¶ 66. For example, Defendant represented that students planning to participate in the Event were required to sign up in advance and participation was capped at one hundred students, but neither of these assertions were true. ECF Doc 34, ¶ 66. There was no sign-up requirement for attendees, and over two hundred students were allowed to attend the Event. ECF Doc 34, ¶ 68. While there were no efforts made by Defendant to minimize the impact of the Event and its promotion on transgender and gender diverse students, Defendant took pains to protect the Speaker and the Club from protests in opposition to the Event. ECF Doc 34, ¶¶ 69, 74, 75, 78. Defendant barred students from protesting the Event in the hallway outside of the Event, secured additional police/security to be present on campus for the Event, and forced a protesting student to move away from the Speaker before the Event started even though they were not posing any risk of harm or disruption. ECF Doc 34, ¶¶ 74-75.

The Event and its promotion have created an ongoing hostile environment for Plaintiff and others. ECF Doc 34, ¶ ¶ 92-97. Plaintiff and other transgender and gender diverse students were forced to see the Event's flyers prominently displayed throughout the school building for multiple days leading up to the Event. ECF Doc 34, ¶ 70, 95-96. They had to listen to the Event's promotion on the morning announcements and read about the Event in the daily bulletin. ECF Doc 34, ¶¶ 71, 95-96. As a result, the background noise that permeates every aspect of Plaintiff's life is now louder, making it more challenging to actively participate in school. ECF Doc 34, ¶ ¶ 92-94, 96-97. The Event and its promotion have taken an emotional toll on Plaintiff, making it

by her position—and her outrage—regarding Defendant's decision to permit conduct that subjected transgender and gender diverse students to blatant harassment.

more difficult to manage the weight that Plaintiff carries and forcing them to work even harder to actively participate in school programs and activities. ECF Doc 34, ¶ 94. The promotion of the Event was an unavoidable and constant reminder of the ignorance and hate to be espoused, making it even more difficult for Plaintiff to go to school and focus on academic and extracurricular activities, thus having a concrete, negative effect on Plaintiff both emotionally and intellectually, and interfering with their ability to participate in school. ECF Doc 34, ¶ 96. Since the Event became public in October, and even more since it was promoted and took place, Plaintiff has engaged less in class discussions out of fear for sharing their viewpoint around others who support the denial of their existence. ECF Doc 34, ¶ 97.

By giving permission for the Event to proceed and be promoted at WAHS, Defendant violated the rights of Plaintiff under Title IX. Defendant knew that the Event and its promotion would include discriminatory language targeting the identities of transgender and gender diverse individuals intended to attack their place in society. ECF Doc 34, ¶¶ 101, 103. Defendant knew that transgender and gender diverse students are already vulnerable and ignored its own policies intended to protect those very students. ECF Doc 34, ¶¶ 104. Defendant knew that the Event and its promotion would create a hostile environment for transgender and gender diverse students, making them more vulnerable to discrimination and harassment. ECF Doc 34, ¶¶ 102, 106.

## ARGUMENT

1. Doe has standing because the injury suffered is ongoing.

Plaintiffs can satisfy the injury in fact requirement for prospective relief by "demonstrating an ongoing injury." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) (quoting *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018)). "[O]ngoing injuries are, by definition, actual injuries for purposes of Article III standing." *Deal v. Mercer*

*Cnty. Bd. of Educ*., 911 F.3d 183, 189 (4th Cir. 2018). "Feelings of marginalization and exclusion are cognizable forms of injury." *Id.* "Continuing, present adverse effects" is sufficient to establish standing with respect to injunctive relief. *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.").

Plaintiff's Amended Complaint plausibly alleges an ongoing injury to Plaintiff resulting from Defendant's deliberate indifference sufficient to establish standing for injunctive relief. Plaintiff experiences significant and ongoing symptoms of anxiety as a result of their gender dysphoria, and Defendant's decision to permit the Event and its promotion have exacerbated those symptoms. ECF Doc 34, ¶¶ 90-97. Before the Event, the symptoms of gender dysphoria and anxiety were like background noise that made everything in Plaintiff's life more difficult. *Id*. at ¶ 90. These symptoms have been exacerbated since the Event and have had an ongoing, concrete impact on Plaintiff's ability to participate in school. *Id*. at ¶¶ 92-97. Plaintiff no longer trusts that Defendant will protect them from discrimination. *Id*. at ¶ 92. Since Defendant authorized the Event and its promotion, Plaintiff has felt emotionally and intellectually drained. *Id*. at ¶ 93. They have broken down sobbing, questioning why their gender identity – who they are – is offensive to others. *Id*. These feelings of marginalization and exclusion have resulted in the background noise that permeates every aspect of Plaintiff's life getting louder, making it more challenging to actively participate in school. *Id*. at ¶ 94. As a result of Defendant's actions, it has become more difficult to manage the weight that Plaintiff carries. *Id*. The Event and its promotion have taken an emotional toll on Plaintiff, forcing them to work even harder to actively participate in school programs and activities. *Id*. Since Defendant authorized the Event, and even

more since it was promoted and took place, Plaintiff has engaged less in class discussions out of fear for sharing their viewpoint around others who support the denial of their existence. *Id*. at ¶ 97. This ongoing injury gives Plaintiff standing to request injunctive relief.

Defendant's vagueness argument is unavailing. Implicit in Plaintiff's request for injunctive relief is the School Board's actual authority to regulate speakers, events, displays and other speech. No one would reasonably understand Plaintiff's prayer for relief as demanding that the School Board assert control over the "next moon landing" or students that fall outside of the School Board's jurisdiction and authority.

Similarly unconvincing is Defendant's suggestion that Plaintiff is seeking to force a school to suppress speech simply based on disagreement with its content. Plaintiff's request is limited to speech that materially and substantially disrupts the educational environment or infringes upon the rights of transgender and gender diverse individuals. This is a regulation of speech that is expressly permitted by the United States Supreme Court as well as every other Federal court in the country, and in no way would require a school to suppress speech just because a student disagreed with it.

2. <u>Doe states a plausible claim for relief under Title IX.</u>

   a. *Doe plausibly alleges that they were subjected to harassment based on sex.*

Defendant argues that "sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). The Club's Event was designed to do just that. The Event and its promotion targeted and ridiculed the very existence of transgender and gender diverse individuals – that much is obvious from the title – thus, humiliating and degrading Plaintiff based on their gender.

"Gender-oriented" conduct can give rise to actionable harassment when it is sufficiently severe or pervasive enough to create a hostile environment. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651-52 (1999); see also *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012); *Medina v. Income Support Div.,* 413 F.3d 1131, 1135 (10th Cir. 2005). When the underlying motivation for the conduct in question is hostility towards a person's gender, it amounts to sex-based harassment. *Wolfe v. Fayetteville, Arkansas School District*, 648 F.3d 860, 865, 867 (8th Cir. 2011); see also *Whitley v. Indep. Sch. Dist. No. 10 of Dewey Cnty., Oklahoma*, No. CIV-18-331-SLP, 2019 WL 7667329, at *6 (W.D. Okla. Apr. 22, 2019). Thus, the Club's attack on transgender and gender diverse identities is sex-based harassment.

Defendant argues that Plaintiff has not plausibly alleged that the promotion of the Event was aimed to humiliate, ridicule, or intimidate, but this is preposterous. For starters, the Club's hostility towards transgender and gender diverse individuals was already apparent given its distribution of buttons displaying "My Pronounces are Patriot" and efforts by Club members to have transgender girls excluded from the girls' restrooms. ECF Doc 34, ¶¶ 39-40. On top of that, the chosen Speaker's hostility towards transgender and gender diverse individuals is also well known. The Speaker denies that sexual orientation and gender identity are immutable; she is opposed to same-sex marriage and advocates for policies denying the identities and rights of transgender and gender diverse individuals; her public comments are dismissive and hostile towards transgender and gender diverse individuals; and she routinely attacks gender-affirming efforts as harmful to society. *Id.* at ¶¶ 47-49.

If these noticeable hostilities were not enough, the title of the Event speaks for itself and clearly communicates that the aim of the Event is to ridicule transgender and gender

diverse identities. Additionally, the Event poster uses the primary colors associated with transgender identity, which Defendant suggests is just a coincidence. But, the “subjective intent and the narrow, plausibly inoffensive, meaning they ascribe to the [colors] used are not controlling. Context is everything.” *Fellers v. Kelley*, No. 24-CV-311-SM-AJ, 2025 WL 1098271, at *13 (D.N.H. Apr. 14, 2025). The context surrounding the Event leads to the reasonable conclusion that the Event is intended to communicate that only two gender identities — male and female — are valid, and any others are invalid or nonexistent. Thus, every time Plaintiff saw one of these posters, read about the Event in the daily bulletin, or heard about the Event on the morning announcements, they were reminded of this overarching message – that their identity is a lie - cutting to their core, belittling their place in society, and reinforcing a feeling of inferiority that is unlikely to ever be undone. This is gender-oriented conduct that constitutes harassment on the basis of sex.

Defendant then argues that it is not harassment because the Speaker did not make her statements in an aggressive manner or in a manner that mocked or ridiculed transgender or gender diverse individuals. First, the theme of the Speakers remarks is that there are only two genders – male or female – and anything else is a lie. If this does not amount to ridicule of transgender and gender diverse individuals, then what does? Second, harassing statements can be made in nonaggressive tones – that does not make them any less harmful. Just because the Speaker may have had a smile on her face while she was belittling the place of transgender people in society, does not mean her remarks were not rooted in bigotry and hate.

It is obvious from the context and the title of the Event itself that the Event was grounded in hostility towards the gender identities of transgender and gender diverse

individuals and that its message was intended to demean and ridicule those identities. Thus, the Club's attack on transgender and gender diverse identities is sex-based harassment.

*b. Doe plausibly alleges that the Event and its promotion was sufficiently severe or pervasive to create a hostile environment.*

Plaintiff has plausibly alleged that the discriminatory speech permeating the Event and its promotion reaches the sufficiently severe or pervasive level creating an environment that a reasonable person would find hostile or abusive and that Plaintiff subjectively perceived as such. See *Jennings*, 482 F.3d at 696. The discriminatory speech in question goes well beyond juvenile teasing and name calling. Rather, the Event and its promotion were a coordinated effort by students, who had already demonstrated hostility towards transgender and gender diverse people, to deny and attack their very identities.

Defendant's argument is that the discriminatory speech at issue is not sufficiently severe because the promotion only lasted a week, no one harassed Plaintiff leading up to the Event, and the Speaker did not communicate her message in a threatening, abusive, or hostile manner. Defendant's argument fails to recognize the social context of the Event as well as the severity of an attack on a person's identity. The nature of the Club's message attacking immutable, core characteristics of transgender and gender diverse individuals makes it severe. "Most people, including—perhaps especially including—adolescent schoolchildren, are highly sensitive" to attacks on unalterable or otherwise deeply rooted personal characteristics. *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204,* 523 F.3d 668, 671 (7th Cir. 2008).

In the context of attacks based on sexual orientation, the Seventh Circuit said

> People are easily upset by comments about their race, sex, etc., including their sexual orientation, because for most people these are major components of their personal identity—none more so than a sexual orientation that deviates from the norm. Such comments can strike a person at the core of his being.

*Id.* The same is true for attacks based on gender identity. "Transgender students face extraordinary social, psychological, and medical risks." *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3d Cir. 2018). "There can be no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity:"

> The risk of experiencing substantial clinical distress as a result of gender dysphoria is particularly high among children and may intensify during puberty…. Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior. When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening.

*Id*.

"Context is everything." *Fellers*, 2025 WL 1098271, at *13. The Club, its members and the Speaker openly showed hostility towards transgender and gender diverse people before the Event, so their intentions were evident. The Event's message - that there are only two genders and any suggestion to the contrary is a lie - "can reasonably be understood" to suggest that those who identify as something other than male or female are wrong and their gender identities are false, inauthentic, nonexistent, and not entitled to respect. *Id.* at 14. Defendant could clearly forecast the harmful impact that this message would inevitably have given that it was at the "most demeaning end of [the] spectrum." *Id*. at 14.

The fact that this harmful message was not only delivered repeatedly throughout the Event's promotion, but also by an adult contributes to its severity. "Demeaning messages of the sort described, delivered during a school-sponsored event, are likely even more damaging to vulnerable students when delivered by adults attending the event." *Id*. The fact that over 200 students participated in the Event further contributes to its severity. See *Riccio*

*v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 227 (D. Conn. 2006) "(the number of students involved is a reasonable way to measure the severity of the harassment"). The fact that the harassment was public similarly contributes to its severity. *Id*.

The severity of the harassment increased even further when a student in attendance at the Event [redacted] said "at a hood school, these trannies would get beaten up." ECF Doc 34, ¶ 79. Not only did this statement include the use of a derogatory slur, but it also included a veiled threat of violence. Defendant enabled this further harassment [redacted] by permitting the Event and its promotion in the first place.

The widespread promotion of the Event and the ongoing statements made by the Speaker and Club members after the Event makes the demeaning message that it espoused pervasive. Plaintiff could not avoid the Event's promotion. Posters promoting the Event were displayed throughout the building. ECF Doc 34, ¶ 70. Those posters prominently displayed the title "Two Genders: One Truth," and for five days it was impossible for Plaintiff to walk through the school building without passing them. *Id*. The Event was also promoted on the morning announcements and through the daily bulletin for multiple days. *Id*. at ¶ 71. As a result, Plaintiff could not avoid hearing the Event's promotion in the morning announcements and reading about the Event's promotion in the daily bulletin. *Id*. The Speaker and Club members then went onto multiple public forums after the Event to further spread their degrading message. Id. at ¶¶ 80-83. All of this made the harassment pervasive.

The Event's message was offensive to a reasonable person under the circumstances, not just Plaintiff. *See Kollaritsch*, 944 F.3d at 621 (citing *Davis*, 526 U.S. at 652). After

seeing the Event poster, WAHS principal quickly determined that the Event could not happen during the school day. ECF Doc 34, ¶ 51. Clearly, she knew there was a problem with the message. Once the public learned about Defendant's decision to override the principal's decision to restrict the Event, there was significant community backlash. *Id*. at ¶ 57. One of Defendant's own board members opposed the decision to permit the Event. *Id*. at ¶ 62. Numerous community members also made public comment to Defendant opposing Defendant's decision and expressing concerns about harm that the Event will cause to transgender and gender diverse students. *Id*. at ¶ 63.

Even without the responses of the principal and community, the message that those who identify as something other than male or female are wrong and their gender identities are false, inauthentic, nonexistent, and not entitled to respect is objectively offensive. See *Fellers,* 2025 WL 1098271, at *14. "Common sense, and an appropriate sensitivity to social context" can lead one to reasonably infer from the allegations in Plaintiff's Amended Complaint that the Event and its promotion involved attacks on transgender and gender diverse identities in a manner that was severe and pervasive creating an environment that a reasonable person would find hostile or abusive and that Plaintiff subjectively perceived as such. *Jennings*, 482 F.3d at 696; *see also Doe v. Georgetown Cnty. Sch. Dist*., No. 2:14-CV-01873-DCN, 2015 WL 5923610, at *7 (D.S.C. Oct. 9, 2015).

Plaintiff plausibly alleges that the discriminatory speech at issue is severe, pervasive and objectively offensive to the point that it has already and will continue to undermine and detract from Plaintiff's experience, thus denying Plaintiff equal access to educational resources and opportunities. See *Davis*, 526 U.S. at 651. [redacted] does not mean that the

environment created by the Event was not hostile or abusive. [redacted] does not make the environment created by Defendant's decision any less hostile. If anything, Defendant's decision made the environment more hostile because the Club is enabled to say whatever it wants to in the name of free speech, no matter how harmful it is to others.

As previously discussed, attacks on gender identity cut to the core, belittling Plaintiff's place in society and creating a feeling of inferiority that is unlikely to ever be undone. The feeling of marginalization and exclusion resulting from Defendant's decision to permit the Event and its promotion have created a disadvantaged learning environment for Plaintiff. See *id*. at 652. The Event and its promotion had a "concrete, negative effect on [Plaintiff's] ability to participate" in school, thus denying Plaintiff equal access to the school's educational opportunities and benefits. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 275 (4th Cir. 2021); see *Jennings*, 482 F.3d at 699; *Doe ex rel. Pullen-Smith v. Qually,* No. 5:20-CV-523-FL, 2021 WL 2546456, at *4–5 (E.D.N.C. June 21, 2021) (unpublished).

Plaintiff has pled sufficient allegations to make the claim plausible. Plaintiff is "not required to prove [their] case at the motion-to-dismiss stage. *Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1311–12 (10th Cir. 2020). "Further, matters of degree—such as severity and pervasiveness—are often best left to the [fact finder]." *Id*. Thus, the severity and pervasiveness evaluation is "particularly unsuited" for dismissal on the pleadings. *Id*. at 1312.

c. *Doe plausibly alleges that Defendant acted with deliberate indifference*.

School districts are liable for subjecting their students to discrimination when they are deliberately indifferent to known acts of harassment. *Davis*, 526 U.S. at 647. School officials are

deliberately indifferent when their response to harassment or lack thereof is clearly unreasonable in light of the known circumstances. *Id*. at 648. School districts are liable when their deliberate indifference causes students to undergo harassment or make them vulnerable to it. *Id*. at 645. In order to avoid being deliberately indifferent, "a school must engage in efforts that are reasonably calculated to end the harassment. *Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 523 (4th Cir. 2025). When schools make "an official decision…not to remedy" but instead decide to "remain idle" in response to known harassment, they are deliberately indifferent. *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016). The type of educational setting must be considered in determining the reasonableness of a response. *Davis* at 649 ("A university might not, for example, be expected to exercise the same degree of control over its students that a grade school would enjoy."). "Deliberate indifference will often be a fact-laden question, for which bright lines are ill-suited." *Roe v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1035 (E.D. Cal. 2009).

Taking the alleged facts and any reasonable inferences therefrom in the light most favorable to Plaintiff, Plaintiff has plausibly alleged that Defendant was clearly unreasonable when it decided to permit the Event and its promotion. Defendant did not just fail to act to protect students from harassment, Defendant enabled the harassment by permitting it over the principal's better judgment. Defendant knows about the vulnerabilities that transgender and gender diverse students face in schools, now more than ever. ECF Doc 34, ¶¶ 7-23, 33-36. Transgender and gender diverse students are under attack and the marginalization that they experience has long-lasting and often life-threatening consequences. *Id*. Recognizing these unique challenges, Defendant adopted a comprehensive Policy on the Treatment of Transgender and Gender-Expansive Students. *Id.* at ¶¶ 33-36. In that policy, Defendant committed to

maintaining a safe and supportive school environment for all students free from harassment, intimidation, and/or bullying and free from discrimination because of actual or perceived biological sex, gender identity, and gender expression, among other protected characteristics. *Id*. The policy requires that schools be vigilant about harassment and address such concerns promptly and thoroughly. *Id*.

Defendant also knew that the Club was hostile to transgender and gender diverse students. Earlier in the year, the Club distributed buttons displaying "My Pronouns are Patriot," and Club members initiated a petition to keep transgender girls out of the girls' bathrooms at WAHS. *Id.* at ¶¶ 38-40. Defendant knows that since the Club's formation, there has been an increase in hate-bias incidents across Albemarle County public schools. *Id*. at 42. Defendant knew that the Speaker for the Event is openly hostile towards transgender and gender diverse individuals, characterizing gender-affirming policies as harmful to society, and denying that their identities are real. *Id*. at 47-49. Given these known hostilities, the title of the Event left no doubt as to what the purpose of the Event was. Defendant also knew that the principal had determined that the Event should be restricted to after school to prevent disruption and that she was clearly concerned about the impact the Event would have on the school environment. *Id*. at ¶¶ 51-52.

Despite all this knowledge, Defendant overrode the principal's decision and decided to permit the Event during the school day without any restrictions. Defendant did not just fail to prevent the harassment that it could reasonably anticipate, but it enabled it. To make matters worse, the Board did not even deliberate and make a decision, but rather the superintendent and school division counsel made a unilateral decision in a mere two business days without any consideration given to applicable policies. *Id*. at ¶¶ 54-55. Once the Board learned of the superintendent's decision and the fallout, efforts were made to save face, but Defendant took no

actions to protect students from the harassment that would result from the Event and its promotion. *Id*. at ¶¶ 57-64. The Club was permitted to hang posters prominently displaying the title "Two Genders: One Truth" throughout the school building in a way that was impossible to avoid. *Id*. at ¶ 70. The Club was permitted to promote the Event in the daily bulletin and morning announcements, similarly impossible to avoid. *Id*. at ¶ 71. Even in the final hour in response to Plaintiff's lawsuit and request for emergency injunctive relief, Defendant doubled down, going so far as to mislead the Court into believing it had taken steps to minimize the impact that the Event would have. Specifically, among those misrepresentations, Defendant asserted that students planning to participate in the Event were required to sign up in advance and participation was capped at one hundred students. *Id*. at ¶ 66. There was no sign-up requirement for attendees, and over two hundred students were allowed to attend. *Id*. at ¶ 68. And there were no other efforts made by Defendant to minimize the impact of the Event and its promotion on transgender and gender diverse students. *Id*. at ¶ 68. In light of all the known circumstances, Defendant's actions (and inactions) were clearly unreasonable.

Defendant argues that it cannot be found deliberately indifferent because its decision to permit the Event was made in response to constitutional and statutory claims asserted by the Club and Speaker in a demand letter to Defendant. Defendant relies on dicta to support this defense. In *Davis*, the court noted in passing that it would be reasonable for a school to refrain from "disciplinary action" that would expose it to constitutional or statutory claims. 526 U.S.at 649. The court made this comment in response to concerns raised about legal constraints on a school's "disciplinary authority." But, the *Davis* Court was not actually faced with this question given the facts before it. In fact, as far as Plaintiff's counsel can tell, no court has applied *Davis'* dicta in a case such as this, where the school simply does nothing to protect vulnerable students

out of fear of constitutional or statutory claims. Nor has any court addressed whether *Davis'* dicta would apply to weak constitutional or statutory claims. This Court should not rely on dicta to establish a bright-line rule to answer a "fact-laden question for which bright lines are ill suited." *Roe*, 678 F. Supp. 2d at 1035.

Furthermore, "disciplinary action" is not at issue in this case. Plaintiff never asked Defendant to expel or otherwise discipline members of the Club – Plaintiff merely wants to attend school without being forced to confront attacks on their identity. Finally, *Davis'* dicta assumes that a school at least did something in response to peer harassment even if it did not take disciplinary action. Thus, it cannot be applied here, where Defendant did nothing to protect transgender and gender diverse students, and actually enabled the harassment.

This Court acknowledged that empty claims would not suffice to shield Defendant from liability for deliberate indifference, but then characterized the claims raised by the Club and Speaker as involving nuanced and unsettled questions of law. Plaintiff respectfully disagrees. First Amendment jurisprudence makes it clear that Defendant can, and has a compelling interest to, restrict discriminatory speech. Defendant's decision to adopt numerous policies restricting discriminatory speech demonstrates Defendant's understanding that it can restrict speech in this way. These policies also demonstrate that Defendant assumed and accepted the risk of limiting discriminatory speech for the purpose of protecting vulnerable students from harassment. Defendant cannot now ignore these policies for fear of litigation.

School districts have a compelling interest in protecting transgender students from discrimination, meaning they *must* act. *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-29 (3d Cir. 2018). When an event is expected to be demeaning, harassing, and psychologically injurious, potentially in severe ways to transgender and gender diverse students,

school authorities are "duty bound" to protect those students from the harassment to follow. *Fellers* 2025 WL 1098271, at *14. The *Fellers* court grappled with the "increasingly common, and commonly difficult constitutional problem: When may public school authorities limit symbolic speech during school athletic contests to protect students from perceived harm?" *Id*. at 1. In determining which right must give way to another, the *Fellers* court determined that First Amendment rights must give way to the rights of transgender and gender diverse students to be free from discrimination and harassment. *Id*. at 11-14. The *Fellers* court concluded that not only could the school district restrict the speech in question, but it was "duty bound" to do so. *Id*. at 14. Defendant not only could have restricted this speech, but it was required to do so. Instead, Defendant overrode the principal's decision despite the fact that she was best suited to know what would be reasonable under the circumstances.

It is well settled that schools may restrict speech that is reasonably anticipated to cause a material and substantial disruption or interfere with the rights of others without running afoul of the First Amendment. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513 (1969). Federal courts have consistently recognized that public school students' First Amendment rights are "not coextensive to those held by others in other contexts," as "most public school students are minors and school administrators have the duty to provide and facilitate education and to maintain order and discipline." *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 255 (4th Cir.2003) (citations omitted). To avoid any doubt, look to the United States Court of Appeals for the First Circuit's decision in *L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854, 864 (1st Cir. 2024), cert. denied sub nom. *L. M. by & through Morrison v. Town of Middleborough, Massachusetts*, 145 S. Ct. 1489 (2025). There, the First Circuit addressed a high school student's right to wear a t-shirt that displayed "There Are Only

Two Genders." The First Circuit concluded that the school district could regulate expression, even when it is silent and passive and does not target a particular student, if it is "reasonably interpreted to demean" a characteristic of personal identity that is "unalterable or otherwise deeply rooted" and "strikes a person to the core of [their] being." *Id*. at 870. Because school administrators understood the t-shirt's message as one that targeted "students of a protected class; namely in the area of gender identity," they determined that the message was "likely to be considered discriminatory, harassing and/or bullying ... by suggesting that [others'] sexual orientation, gender identity or expression does not exist or is invalid." *Id*. at 862.

Similarly, in *Fellers*, a Federal District Court held that the school district's decision to restrict individuals from wearing wristbands opposing transgender girls participating in girls' sports to a school-sponsored activity did not violate the First Amendment because they could be "reasonably interpreted in context to convey a harassing, demeaning message likely to have a serious negative psychological impact on students who identify as transgender." 2025 WL 1098271, at *12. "Displaying of a symbolic expressive message that is reasonably understood to demean the gender identity of a specific transgender high school athlete (or transgender students generally), can be regarded by school authorities as targeting, harassing, intimidating, bullying, and abusive of those students." *Id*. at 14. Defendant can and must restrict this sort of discriminatory speech.

Defendant further relies on the Court's denial of Plaintiff's request for a temporary restraining order and preliminary injunction as a basis for arguing that Plaintiff has not plausibly alleged deliberate indifference. First, the bar to state a cognizable claim is much lower than the bar for emergency injunctive relief. Moreover, that decision was based, in part, on misrepresentations by Defendant and thus flawed. The Court concluded that because Defendant

consulted with counsel and "laid out parameters for the event to ensure that it could proceed behind closed doors without disrupting the school or violating any laws," it cannot be deemed deliberately indifferent. *Doe v. Albemarle Cnty. Sch. Bd.*, No. 3:25-CV-00094, 2025 WL 3225052, at *2 (W.D. Va. Nov. 18, 2025). As alleged in Plaintiff's Amended Complaint, the representations by Defendant that led the Court to this conclusion were simply not true. ECF Doc 34, ¶¶ 68-69. No steps were taken by Defendant to protect students from this discriminatory speech, even though Defendant acknowledged repeatedly that it would cause harm. The Court further reasoned that Defendant was not deliberately indifferent because it consulted with counsel and its decision was at least arguably consistent with school policy. Again, this conclusion is misplaced. Defendant's decision was made in direct contradiction with its policies – nothing about the decision arguably comported with school policy.

Defendant argues that failure to follow its own policies does not amount to deliberate indifference. The cases cited by Defendant are specific to failures to follow sexual harassment grievance procedures during responses to and investigations of sexual harassment. Furthermore, in those cases, the schools had been responsive to reports of sexual harassment even where they did not adhere fully to their own policy. Thus, the courts concluded that policy violations alone did not amount to deliberate indifference. Those cases are distinguishable from the facts of this case. In this case, Defendant did not only act in direct contradiction to its own policy, but it also completely ignored its policy, which expressly prohibits harassment and discrimination against transgender and gender diverse students. Moreover, despite being aware of the harm the Event would cause, Defendant took no action to protect those students, but actually took actions to protect the Speaker and Club by restricting the speech of those who wanted to protest the Event. Defendant claims to believe that the First Amendment left it no choice but to permit the Event,

while at the same time stifling the free expression of those who wanted to protest the Event. How could both be true? Given the totality of the circumstances in this case, including, *but not limited to*, Defendant's deliberate decision to completely ignore applicable policies, Plaintiff has plausibly alleged that Defendant was deliberately indifferent to the harm that the Event and its promotion would cause.

The Court also relied on the Board's continued deliberation, debate and communication with the public as a basis for concluding that it was not deliberately indifferent. Again, this conclusion is based on a misunderstanding of what actually occurred. The Board did not deliberate or debate this decision at all – the decision was made by the Superintendent who did not even consult with the Board. ECF Doc 34, ¶ 54. Once the decision was made, despite the public outcry, the Board did not deliberate the issue further and never once even considered changing the superintendent's decision. *Id*. at ¶ 59. The "communication with the public" came after significant community backlash and was merely an effort to save face – it was never about protecting transgender and gender diverse students. Merely listening to students' complaints does not suffice. See *Hurley*, 911 F.3d at 690. There was no thoughtful consideration by the Board before or after the Board's communication with the public and public comment. The decision to permit the Event was made in two business days, by the superintendent and school division counsel, without any discussion or deliberation by Defendant, and without any consideration of applicable policies.

Defendant's suggestion that the school board was faced with a Hobson's choice ignores reality. The Board never deliberated and did not make the choice – the superintendent did, only considering the threat of litigation from the Club and Speaker. The superintendent did not consider the transgender student policy or Defendant's obligations under Title IX – he simply

cowered to the demands of individuals intending to demean transgender and gender diverse individuals, including students that he has a duty to protect.

Even if Defendant believed it could not legally restrict the Event, which is dubious, it still did absolutely nothing to protect Plaintiff and others from the harassment to come. Defendant's attempts to spin their "security" measures as intended to protect Plaintiff and others is unconvincing. Students who wanted to protest the Event were not permitted to do so. How does that protect transgender and gender diverse students from harassment? Students who wanted to leave the Event early were not permitted to do so. How does that protect students from harassment? The steps taken by Defendant after the fact were not to protect students from the harassment.

When a school takes only "limited steps in response to the harassing and threatening [conduct], those actions do not preclude Title IX liability." *Id*. Defendant's actions amounted to "an official decision not to remedy the discrimination." *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1120 (9th Cir. 2023). Like in *Grabowski*, Defendant took "no meaningful action in response" to concerns raised and then "lied" about its response. *Id*. Those allegations are enough at the motion to dismiss stage to establish a claim of deliberate indifference. *Id*.

## CONCLUSION

Taking the allegations in the Amended Complaint and all reasonable inferences drawn therefrom as true, Plaintiff's Title IX claim crosses the plausibility line. The Motion to Dismiss should therefore be denied.

Respectfully submitted,

/s/ *Lauren E. Baum*

Lauren E. Baum, Esq.
Law Office of Lauren E. Baum, PC
240 W Main St
Suite 100 - V32
Charlottesville, VA 22902
202-450-1396
l.baum@laurenebaumlaw.com
*Pro Hac Vice*

Alexis I. Tahinci
VSB No. 85996
Tahinci Law Firm PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
Tel: (423) 406-1151
Fax: (423) 815-1728
alexis@tahincilaw.com