CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
September 14, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| J. Doe, Plaintiff, | ) | |
| v. | ) | Civil Action No. 3:25-cv-00094 |
| Albemarle County School Board and Victoria Cobb, Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff J. Doe is a nonbinary student who attends a high school that is operated by Defendant Albemarle County School Board ("ACSB"). Doe has experienced gender dysphoria for as long as they can remember. As a result of discomfort with their biological sex and experiences being misgendered, Doe has battled significant symptoms of anxiety. In September 2025, a Turning Point USA ("TPUSA") student club at Western Albemarle High School ("WAHS") informed the principal that they planned to host guest speaker and Defendant Victoria Cobb for an event entitled "Two Genders: One Truth." Cobb, the president of a Christian lobbying organization, has publicly opposed gender affirming efforts and denied that gender identity is immutable. After receiving community pushback, as well as demand letters advocating both for and against allowing the event, ACSB decided that the speaker event could proceed as a club meeting during the lunch hour, where student

attendance was voluntary, so long as the event remained orderly and respectful. The club promoted the event with flyers throughout the school during the week leading up to the event.

On November 17, 2025, two days before the scheduled speaker event, Doe sued ACSB under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), claiming that ACSB's decision to allow the TPUSA club to host and promote the Event constituted deliberate indifference to severe and pervasive sex-based harassment. That same day, Doe moved this court for a preliminary injunction prohibiting ACSB from allowing WAHS to host the event. The court denied Doe's motion for a preliminary injunction, finding that they did not make a clear showing that they are likely to succeed on the merits of the "deliberate indifference" element of their Title IX claim. The event was held as scheduled on November 19. Doe has since amended their complaint.

This matter is before the court on ACSB's motion to dismiss the amended complaint, (Dkt. 40), and Cobb's joinder in ACSB's motion to dismiss, (Dkt. 44). For the following reasons, the court will grant the motions.

## I. Background

The facts in this section are taken from Doe's amended complaint, (Dkt. 34), and are accepted as true for purposes of resolving the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

Plaintiff Doe is a nonbinary student who attends an Albemarle County Public Schools ("ACPS") high school. (Am. Compl. ¶¶ 5, 89.) Doe is [redacted] and hopes to attend college. (*Id.* ¶¶ 86–87.) They

have had "feelings of gender dysphoria and discomfort with their biological sex" "[f]or as long as [they] can remember." (*Id.* ¶ 88.) Doe came out as nonbinary during [redacted] and began using the pronouns "they/them." (*Id.* ¶ 89.) Since then, they have been misgendered by other students and at least one teacher on many occasions—an experience shared by gender diverse students at WAHS. (*Id.*) As a result of their gender dysphoria, they have endured "significant symptoms of anxiety." (*Id.* ¶ 90.) It is challenging for them to focus on academic and extracurricular demands while experiencing gender dysphoria, grappling with anxiety, and knowing that people—including adults and peers—deny their existence. (*Id.*)

ACSB is responsible for operating Albemarle County Public Schools, which includes WAHS. (*Id.* ¶ 6.) ACPS promulgates the policies for these schools. (*Id.*) The policies include:

> (1) an Equal Educational Opportunities Policy and a Nondiscrimination Policy, which prohibit discrimination against students on the basis of sex, gender, and gender identity and recognize ACSB's duty to provide a climate free from such discrimination, (*id.* ¶ 25);
>
> (2) a Prohibition Against Harassment and Retaliation Policy, which forbids any student or school employee from harassing a student based on a protected group status, bars any personnel from "tolerat[ing] harassment . . . at school or any school sponsored activity," and defines harassment as including demeaning or harmful actions directed at personal characteristics like gender identity, even if they do not rise to the level of illegal harassment, (*id.* ¶¶ 26–27);
>
> (3) a Student Conduct Policy, which provides that "[e]very student has a right to a quality education in an environment that is conducive to learning and free of disruption," that "every student has the responsibility not to deny that right to others," and that any conduct, clothing, or displays "that demean or promote harassment or hatred toward an identifiable person or group based on . . . gender[] [or] gender identity . . . are prohibited," (*id.* ¶¶ 28–29);
>
> (4) an Employee Standards of Conduct Policy, which necessitates employee adherence to all other policies and forbids an employee from using their position and associated access "to promote a political candidate or controversial issue," (*id.* ¶ 30);

> (5) a Political Activities Policy, which "prohibits employees from using their position, employment status, or access within the School Division to further a political cause," (*id.* ¶ 31); and
>
> (6) a Distribution of Materials by School-Sponsored or Governmental Organizations Policy, which proscribes Albemarle County Public Schools' distribution or display of "communications from any organization that would: endorse or encourage any violation of the Student Conduct Policy; cause ACPS to violate state or federal laws or its policies; or promote illegal discrimination," (*id.* ¶ 32).

Finally, ACSB has implemented a Policy on the Treatment of Transgender and Gender-Expansive Students. (*See id.* ¶¶ 33–36.) This policy acknowledges the unique challenges transgender and gender-expansive students face at school. (*Id.* ¶ 34.) It seeks to "maintain a safe and supportive school environment for all students free from harassment, intimidation, and/or bullying and free from discrimination because of actual or perceived biological sex, gender identity, and gender expression, among other protected characteristics." (*Id.* ¶¶ 33–34.)

### A. Creation of the TPUSA Club

In late 2024, WAHS students created a TPUSA club ("the Club") with the support of Michelle Karpovich, the "very active" teacher sponsor. (*Id.* ¶¶ 1, 37, 72.) The Club has received "financial support and direction from individuals outside of the school." (*Id.* ¶¶ 38, 73.) It began recruiting members in early 2025 by distributing "national promotion kits," handing out buttons displaying the message "My Pronouns are Patriot," and hosting giveaways with prizes "such as donuts, pizza, [and] gift cards." (*Id.* ¶¶ 38–39.) In October of 2025, the Club members created a petition demanding that transgender girls be kept out of the WAHS

girls' bathrooms. (*Id.* ¶ 40.) Since the Club was formed, "there has been an increase in hate-bias incidents across Albemarle County [P]ublic [S]chools." (*Id.* ¶ 42.)

Although the Club purports to be bipartisan, it hosts events with outside speakers who are exclusively "Republican politicians and conservative activists/influencers." (*Id.* ¶ 41.) These speakers have discussed abortion, immigration, and other "controversial topics." (*Id.* ¶ 43.) One of the Club's speaker events hosted Congressman Bob Good. (*Id.* ¶¶ 43, 60.) The event was held in Karpovich's classroom during lunch and "ran over the lunch period by nearly a half an hour." (*Id.*) Karpovich's class was scheduled immediately following lunch, and she "forced" students who arrived for that class "to listen to the speaker for nearly a half hour." (*Id.* ¶ 43.) Karpovich has also traveled with Club members on out-of-state trips, helped with the planning and promotion of events, and supervised other activities. (*Id.* ¶ 72.)

**B. Planning of the Event and ACSB's Decision**

On or around September 25, 2025, WAHS Principal Jennifer Sublette received a flyer promoting the Club's upcoming speaker event entitled "Two Genders One Truth" ("the Event"). (*Id.* ¶¶ 1, 44.) The Club planned to host Victoria Cobb, President of the Family Foundation, as a guest speaker for the Event ("the Speaker"). (*Id.* ¶ 45.) Family Foundation of Virginia is "a socially conservative and Christian fundamentalist lobbying organization" based in Richmond, Virginia. (*Id.* ¶ 47.) The Speaker and the Family Foundation "deny that sexual orientation and gender identity are immutable," oppose same-sex marriage, and "advocate for policies denying the identities and rights of transgender and gender-expansive individuals." (*Id.* ¶ 48.) The Speaker regularly denounces gender-affirming care. (*Id.* ¶ 49.)

She also makes public comments that are "dismissive and hostile towards transgender and gender-expansive individuals." (*Id.*)

According to the flyer provided to Sublette, the Event was originally scheduled for October 1, 2025, at the school during lunch. (*Id.* ¶ 44.) The flyer depicted the Speaker, the "Turning Point USA" logo, the title "Two Genders One Truth," and other Event logistics. (*Id.*)

The same day she received the flyer, Sublette informed the Club that the event could not occur during the school day:

> Thank you for meeting with me today. During our meeting we discussed your club's plans to host Victoria Cobb from the Family Foundation on October 1 as a guest speaker on the topic "Two Genders One Truth" to quote from the flyer that was left in my mailbox before school this morning.
>
> During our time together, I pointed out that you and I had reviewed the club's plans for guest speakers at the start of the year and that this speaker had not been discussed at that time. I expressed my position that gender identity is a complex and controversial topic and that I wanted to support your club while also ensuring that hosting an open event focusing on this topic would not lead to a disruption to our instructional day. In addition to the mature content of this speaker, as you know our lunch period is 35 minutes long and we have previously had issues with special speaker events for TPUSA running over into the instructional block.
>
> My direction was that this club event would need to be offered after the school day. I offered open access to our building and supervision for students before and after the event given that our student activity bus runs at 6:45.
>
> Again, thank you for meeting with me. As I have shared with you before, I have appreciated that we have been able to work together to support your club activities and ensure students have access to the chapter you have created.

(*Id.* ¶ 51.)

On September 26, 2025, the Founding Freedoms Law Center ("FFLC") sent a demand letter to Josiah Black, School Division Counsel, on behalf of the Club, Karpovich, and the Speaker. (*Id.* ¶ 53.) The demand letter asserted that "the School Division was engaged in unlawful viewpoint discrimination" by preventing the Club from allowing the Speaker to present at a lunchtime meeting due to the complex, controversial, and mature nature of the topic.[1] (*Id.*; Dkt. 41-1 at 1.) Specifically, the letter argued that under Supreme Court cases like *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), *Texas v. Johnson*, 491 U.S. 397 (1989), and *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001), the school's decision to bar Cobb from speaking at the Event during a lunch hour constitutes a breach of the First Amendment. (Dkt. 41-1 at 3–4.) FFLC also argued that the school's decision violates the Equal Access Act. (*Id.*) The letter ended by demanding that ACPS "confirm that the Club will be permitted to host this event with Ms. Cobb during an ordinary lunch period in the immediately forthcoming weeks." (*Id.* at 5.)

On September 30, following consultation with Black, Superintendent Dr. Matthew Haas decided to allow the Event to proceed during the school day. (Am. Compl. ¶ 54.) Haas did not give ACSB any opportunity to deliberate or weigh in on the decision before Black and

[1] ACSB attaches a copy of the demand letter to its initial motion to dismiss brief. (Dkt. 41-1.) A court can consider documents "incorporated into the complaint by reference," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic," *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The amended complaint explicitly refers to the FFLC demand letter and briefly summarizes its contents. (*See* Am. Compl. ¶ 53.) Moreover, the contents of the letter are important to the parties' arguments about the "deliberate indifference" element of the Title IX claim. (*See* Def.'s Br. at 17–18; Pl.'s Br. at 17–20; Def.'s Reply at 13–17.) Given Doe's express invocation of the document and the lack of dispute about its authenticity, the court can consider the demand letter attachment without converting the motion to dismiss to a motion for summary judgment. *See Goines*, 822 F.3d at 167; *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 486 (E.D. Va. 2018).

Haas decided to allow the Event. (*Id.*) Doe also alleges that Haas and Black "failed to consider existing ACPS policies when they decided to permit the Event and its promotion." (*Id.* ¶ 55.)

### C. Student and Community Response to ACSB's Decision

Doe was "shocked and disappointed" to learn about the Event. (*Id.* ¶ 91.) Before the Event, they had generally felt that WAHS was supportive, despite there being a "subset of students and teachers who denied their identity and existence." (*Id.*) Now, Doe "no longer trusts that [ACSB] will take necessary steps to protect transgender students from discrimination and harassment." (*Id.* ¶ 92.) Moreover, after ACSB authorized the Event and its promotion, Doe has "felt emotionally and intellectually drained." (*Id.* ¶ 93.) They have wept about how others find their gender identity offensive. (*Id.*) Given that the Club has "targeted a specific group of individuals," of which Doe is a member, Doe has had to "work even harder to actively participate in school programs and activities." (*Id.* ¶ 94.)

Following Haas's decision, ACSB faced "significant community backlash" surrounding the Event. (*Id.* ¶ 57.) Thereafter, on October 3, the School Division issued a "Message to Our ACPS Community" signed by Superintendent Haas, School Board Chair Dr. Kate Acuff, and School Board Vice Chair Dr. Rebecca Berlin.[2] (*Id.*; *see* Dkt. 41-2 at 2.) The message first underscored ACSB's "commitment to the safety, well-being, and success of every student." (Am. Compl. ¶ 57; Dkt. 41-2 at 1.) It acknowledged ACSB's responsibility to "maintain a safe and respectful school environment . . . where every student—regardless of background,

---

[2] ACSB attaches a copy of the October 3 community message, which was posted on ACSB's public website, to its motion to dismiss. (Dkt. 41-2; *see* Def.'s Br. at 5 n.2.) Because Doe expressly referenced and relied on the message in their amended complaint, (Am. Compl. ¶ 57), and there is no dispute as to the attachment's authenticity, this court may consider the community message at this juncture. *See Spirito*, 350 F. Supp. 3d at 486.

identity, or beliefs—feels valued and supported." (Dkt. 41-2 at 1; *see* Am. Compl. ¶ 57.) The message then confirmed that the Event will take place during the Club's regular lunch meeting time and only for those students who choose to attend. (*See* Dkt. 41-2; Am. Compl. ¶ 57.) ACSB recognized "that many strongly disagree" with its decision to allow the Club to host the Event during lunchtime, and that community discussions "have left many feeling angry, frustrated, or invalidated," but that their "policies require [them] to ensure students' constitutional rights to assemble and hear diverse perspectives." (Dkt. 41-2 at 1–2.) The message concluded with a request for community members to engage "in a spirit of respect." (*Id.* at 2.)

ACSB issued another community message in advance of the next regular board meeting, which was scheduled for October 9, 2025. (Am. Compl. ¶ 58.) The October 8 message acknowledged the potential for disruption at the meeting. (*Id.*) ACSB took steps to increase security, such as adding "a weapons screening process not typically in place for regular board meetings." (*Id.*)

As planned, ACSB convened for the board meeting on October 9, 2025.[3] (*Id.* ¶ 59.) The Event was not included on the meeting agenda. (*Id.*) However, at the beginning of the meeting, Haas addressed ACSB's decision to allow the Event. (*Id.* ¶ 60.) He stated that federal and constitutional law required ACSB to allow the Event, and that the Club's previous

[3] The Fourth Circuit has held that the court may only consider a video recording at the motion-to-dismiss stage "when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video clearly depicts a set of facts contrary to those alleged in the complaint, or blatantly contradicts the plaintiff's allegations, rendering the plaintiff's allegations implausible." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (cleaned up). The recording of the school board event does not meet the "high bar" of "blatantly contradict[ing]" Doe's allegations such that their "version of events [is] utterly discredited by the video recording." *Id.* at 679–80 (cleaned up). The court will not consider the October 9 school board meeting video recording in resolving the motion to dismiss.

speakers had not caused disruption. (*Id.*) In their amended complaint, Doe notes that there had in fact been disruption surrounding the Club's previous Bob Good event, discussed *supra* in Section I.A, as it had extended into class time. (*Id.*) Haas's remarks did not reference the school policies on nondiscrimination, harassment prohibition, transgender and gender-expansive students, or any of the policies listed earlier in Part I. (*Id.* ¶ 61.) Board Member Allison Spillman also gave remarks about how she endured "a coordinated campaign of harassment and intimidation" after speaking out against the Event on social media. (*Id.* ¶ 62.) She recounted receiving thousands of messages containing harassment and threats against her family and other WAHS students. (*Id.*)

Then, "[n]umerous speakers gave public comment opposing the decision to permit the Event . . . and informing [ACSB] of the harm that the Event will cause to transgender and gender diverse students." (*Id.* ¶ 63.) ACSB "did not engage in any discussion or deliberation after public comment was provided." (*Id.* ¶ 59.) Rather, Doe alleges that the decision had been made prior to the meeting, and ACSB "never even considered reversing Dr. Haas' decision despite the concerns raised through public comment." (*Id.*)

On October 27, several weeks after the board meeting, Doe's counsel—before being retained by Doe—sent a memo to ACSB about the Event.[4] (*Id.* ¶ 64.) The stated purpose of the memo was to provide "relevant case law and precedent" showing that ACPS should

[4] ACSB attaches this memo to its motion to dismiss. (Dkt. 41-3.) Doe explicitly relies on this memo in their amended complaint, summarizes its contents, and points to it as evidence that ACSB was on notice that it was violating Title IX. (Am. Compl. ¶ 64.) Additionally, Doe does not challenge the authenticity of ACSB's attachment. Accordingly, the court can consider the full memo attachment in resolving the motion to dismiss. *See Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)) ("[W]e may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'").

reevaluate their decision about the Event, and "place ACPS on notice that a coordinated effort to protect the rights of ACPS students who have been, and are being targeted, by Turning Point USA, is being mobilized and will secure protection from the courts as necessary." (Dkt. 41-3 at 1.) The memo cites a number of Supreme Court and circuit cases, including *Tinker*, *Mahanoy Area Schl. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180 (2021), and *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). (*Id.* at 2–3.) It discusses ACPS's policies, asserting that these and ACPS's educational mission conflict directly with the Event. (*Id.* at 3–4.) It contends that the Event constitutes a substantial disruption to the school caused by the accompanying hostile environment and discriminatory speech. (*Id.* at 4–6.) Finally, the memo argues that the School Division has an affirmative duty under Title IX to prevent the Event, "which is reasonably anticipated to result in discrimination against gender-expansive students." (*Id.* at 6–8.) Doe alleges that Black dismissed Doe's counsel's memo "without any deliberation or consideration by [ACSB]." (Am. Compl. ¶ 64.)

**D. Initiation of the Instant Lawsuit**

Doe engaged counsel on November 15, 2025. (*Id.* ¶ 65.) On November 17, 2025, Doe filed a single-count complaint against ACSB. (Dkt. 1.) The complaint claimed that, by giving TPUSA permission to hold their event with Cobb at WAHS, ACSB violated Doe's rights under Title IX. (*Id.* ¶ 55.) Doe concurrently filed a motion for a temporary restraining order ("TRO"), (Dkt. 3), and a motion for a preliminary injunction, (Dkt. 7). These motions sought to enjoin ACSB from allowing the Club to host the November 19 speaker event at WAHS. (Dkts. 3, 7.)

In an order entered the same day, this court found that the factors allowing for *ex parte* injunctive relief under Rule 65(b) were not met and thus ordered Doe to provide ACSB with notice of the suit and motions by the end of the day. (Dkt. 8.) The court scheduled a virtual hearing on the motion to be held the following afternoon, November 18. (Dkt. 9.) Doe alleges that, during this hearing, ACSB "made material misrepresentations to the Court" including "represent[ing] that students planning to participate in the Event were required to sign up in advance and participation was capped at one hundred students." (Am. Compl. ¶ 66.) Following the November 18 hearing, the court denied Doe's motion for TRO and preliminary injunction. (Dkt. 22.)

**E. Promotion of the Event**

During the week before the Event, ACSB let the Club display posters promoting the Event throughout WAHS. (Am. Compl. ¶ 70.) The posters were hung "on every wall in the building outside of classroom spaces" for at least five days. (*Id.*) They depicted the Event's title, "Two Genders: One Truth." (*Id.*) ACSB also allowed the Club to promote the Event on the morning announcements and in the daily bulletin for at least three days before the Event. (*Id.* ¶ 71.) Doe could not avoid the posters, the announcements, or the bulletin. (*Id.*) The promotion served as a "constant reminder that the intent of the Event was to deny [Doe's] very identity," which made it even more difficult for Doe to attend school and focus on their activities. (*Id.* ¶¶ 95–96.) It had a "concrete, negative effect on [Doe] both emotionally and intellectually." (*Id.* ¶ 96.) Since October, when the debate surrounding the Event began, Doe

has "engaged less in class discussions out of fear for sharing their viewpoint around others who support the denial of their existence." (*Id.* ¶ 97.)

**F. Completion of the Event and Post-Event Publicity**

The Event proceeded on November 19, 2025. (*Id.* ¶ 67.) ACSB increased the police and security presence on campus for the event. (*Id.* ¶ 75.) According to posts made by Cobb and the Club on social media, over two hundred students attended. (*Id.* ¶ 68 n.3.) There was no sign-up requirement for attendees. (*Id.* ¶ 68.) ACSB barred students from protesting outside of the Event. (*Id.* ¶ 74.) Once students entered the Event, they were not permitted to leave before it ended, "even if they only went for the free pizza." (*Id.* ¶ 77.) The Club and school explained that this rule was imposed for security reasons. (*Id.*)

[redacted]

During the Event, Cobb spoke about gender identity and against transgender policies. (*Id.* ¶ 76.) Specifically, she argued that (1) "policies that allow transgender individuals to use the restrooms and/or locker rooms consistent with their gender identity posed a risk to safety," (2) "no policies should be driven by gender but rather should only be rooted in biological sex," (3) "individuals cannot transition genders" as "a matter of basic biology," and (4) "anytime someone tries to cancel speech that they oppose, it means that they know their

position is weak." (*Id.*) Towards the end of the Event, one student [redacted] stated, "at a hood school, these trannies would get beaten up." (*Id.* ¶ 79.)

After the Event, the Speaker and the Club continued to discuss the Event and its message about transgender identities publicly. (*Id.* ¶ 80.) The day after the Event, leaders of the Club spoke on a local radio show. (*Id.* ¶ 81.) They argued that Doe and others opposed to the Event "should have just kept their mouths shut" and let the Event proceed. (*Id.*) They declared that Doe's lawsuit was "absolutely ridiculous," that Doe is "scared of the truth," and that there exist only two sexes and thus two genders. (*Id.*) The Speaker appeared on the same radio show the following day, November 21, and conveyed a similar message. (*Id.* ¶ 83.) The Club leaders also took to social media, mocking the WAHS science teacher who asked the Speaker about her science background and expertise during the Event. (*Id.* ¶ 82.)

Albemarle High School ("AHS"), another ACPS school, recently created a Turning Point USA chapter. (*Id.* ¶ 84.) The WAHS Club leaders are mentoring and guiding the AHS chapter. (*Id.*) Like WAHS, AHS hosted Congressman Bob Good as their first speaker. (*Id.*)

## II. Standard of Review

### A. Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction over a complaint. *See* Fed. R. Civ. P. 12(b)(1). A federal court may hear a case only when it has subject matter jurisdiction. Under Article III of the U.S. Constitution, a federal court may exercise subject matter jurisdiction only over "cases" and "controversies." U.S. Const. Art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559

(1992). "Embedded in this limitation is a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). To establish Article III standing, plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

**B. Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). It does not "resolve contests surrounding the facts or the merits of a claim." *Doriety for Estate of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When reviewing a Rule 12(b)(6) motion to dismiss, the court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). But the court does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted

inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (cleaned up).

## III. Analysis

### A. Title IX Claim

Title IX declares that, with certain enumerated exceptions, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "A Title IX plaintiff may pursue a private cause of action against—and obtain damages from—a 'funding recipient [that] engages in intentional conduct that violates the clear terms of the statute.'" *Doe 2 by & through Doe 1 v. Fairfax Cnty. Sch. Bd.*, 832 F. App'x 802, 804 (4th Cir. 2020) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)). To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that: "(1) the educational institution receives federal funds; (2) the plaintiff 'was subjected to harassment based on [their] sex'; (3) 'the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity'; and (4) 'there is a basis for imputing liability to the institution.'" *Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484, 491 (4th Cir. 2025) (quoting *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018)); *see Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007).

Here, there is no dispute that ACSB is a recipient of federal financial assistance for Title IX purposes. (*See* ACSB's Br. at 12 (Dkt. 41); Am. Compl. ¶ 99.) But ACSB contends that Doe falls short on stating the other three elements of the Title IX claim. Specifically,

ACSB argues that Doe fails to plausibly allege (1) that they were subjected to sex-based harassment, (2) that the harassment was sufficiently severe or pervasive, and (3) that there is a basis for imputing liability to ACSB. The court will address each element in turn.

1. <u>Actionable Sex-Based Harassment</u>

Sex-based harassment occurs when "a [student] is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc). The language need not be directed specifically at the plaintiff to be relevant to whether the plaintiff was subjected to sex-based harassment. *Id.*; *see Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (considering, for a Title VII claim, not only hostile comments directed specifically toward plaintiff but also hostile comments about Black individuals *in general*). Courts often "look to case law interpreting Title VII . . . for guidance in evaluating a claim brought under Title IX." *Jennings*, 482 F.3d at 695.

*i. Harassment Based on Sex*

ACSB first argues that Doe does not plausibly allege that the Event and its promotion constituted sex-based harassment. (ACSB's Br. at 12–14.)

Here, the assertion that there are only two genders, as expressed through the title of the Event and the surrounding context, denies the very existence of Doe's gender identity. The Speaker's prior public comments about gender identity and the Club's previous petition against transgender girls using girls' bathrooms, (*see* Am. Compl. ¶¶ 40, 44, 47–50), make clear that the "Two Genders: One Truth" Event and the Speaker's message oppose the recognition and support of nonbinary and gender diverse identities. The complaint alleges Doe was

subjected to this message through the flyers posted "on every wall" in the school building for five days leading up to the Event, the three days of promotion in the morning announcements and daily bulletin, and the Speaker's statements to Doe and hundreds of their peers. (*Id.* ¶¶ 68, 70–71; *see id.* ¶ 76 (alleging that the Speaker asserted "that policies that allow transgender individuals to use the restrooms and/or locker rooms consistent with their gender identity posed a risk to safety," "that no policies should be driven by gender but rather should only be rooted in biological sex, and "that individuals cannot transition genders and that this was a matter of basic biology").) Moreover, the comment [redacted]—that "at a hood school, these trannies would get beaten up," (*id.* ¶ 79)—employs derogatory, name-calling language. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014) (noting that "the use of sexually degrading, gender-specific epithets . . . has been consistently held to constitute harassment based upon sex" under Title VII (quoting *Forrest v. Brinker Intern. Payroll Co.*, 511 F.3d 225, 229 (1st Cir. 2007))).

ACSB asserts that the Speaker's statements do not constitute harassment, as Doe "does not allege that Ms. Cobb conveyed her statements in an aggressive manner or in a manner that mocked or ridiculed individuals who are transgender or gender diverse." (ACSB's Br. at 13–14.) But ACSB does not provide any case law requiring that discriminatory or offensive statements be made with an aggressive or mocking tone to constitute harassment. Rather, the message—that Doe's gender identity is invalid or nonexistent—is inherently offensive, "degrading[,] and humiliating" to Doe, regardless of the way in which this message is delivered.

*Jennings*, 482 F.3d at 695; *see L.M. v. Town of Middleborough*, 103 F.4th 854, 881–82 (1st Cir. 2024); *Fellers v. Kelley*, No. 24-cv-00311, 2025 WL 1098271, at *12–13 (D.N.H. Apr. 14, 2025).

Other courts have also recognized the emotional and mental harm imposed by statements or symbols expressing opposition to certain gender identities or sexual orientations, without placing any emphasis on the way these messages are communicated. In *L.M. v. Town of Middleborough*, the First Circuit held that a school could require a seventh grader to remove his shirt, which stated "There Are Only Two Genders," without violating the First Amendment. 103 F.4th 854, 861–62, 883 (1st Cir. 2024). In doing so, the court explained that even this silently expressed speech, not targeted towards specific students, has a "demeaning nature" that has a "tendency to poison the educational atmosphere." *Id.* at 881. Further, the court wrote, officials "knew the serious nature of the struggles, including suicidal ideation, that some of those students had experienced related to their treatment based on their gender identities by other students, and the effect those struggles could have on those students' ability to learn." *Id.* The court recognized that the "message is not at the farthest end of demeaning," but that it nevertheless "denies the self-conceptions of certain middle-school students" that "are no less deeply rooted than those based on religion, race, sex, or sexual orientation." *Id.*; *see, e.g.*, *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178–80 (9th Cir. 2006), *vacated as moot by Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007) (characterizing a t-shirt stating "Homosexuality is Shameful" as "demeaning," "injurious to gay and lesbian students," and a "psychological attack[] that cause[s] young people to question their self-worth and their rightful place in society); *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist.*

*# 204*, 523 F.3d 668, 671 (7th Cir. 2008) (upholding a school rule that prohibits "(1) derogatory comments on (2) unalterable or otherwise deeply rooted personal characteristics about which most people, including—perhaps especially including—adolescent schoolchildren, are highly sensitive" (emphasis omitted)). While many of these cases do not involve Title IX claims and thus do not directly address whether the Event and its promotion could constitute Title IX sex-based harassment, they underscore the humiliation and offensiveness of language that rejects the existence of transgender or gender diverse identities.

The court recognizes that, in many other Title IX cases, the behavior challenged as harassment involves targeted insults towards the victim, threats of violence, or physical touching. *See, e.g.*, *Hurley*, 911 F.3d at 680 (discussing a Title IX claim based on verbal harassment including online posts "express[ing]—in offensive terms—strong criticism of Feminists United and its members," chants "that glorified violence against women, including rape," and screams of "Fuck the feminists!"); *Jennings*, 482 F.3d at 695 (holding there were sufficient facts for a jury to find the coach subjected plaintiff to sexual harassment where he repeatedly asked about team members' sexual experiences, commented on their genitalia and breasts, and discussed his sexual fantasies); *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 261, (describing allegations that another student sexually assaulted the plaintiff by physically touching her). While these factors inform the court's analysis for the "severe or pervasive" prong, the Fourth Circuit has never categorically held that these elements of violence, repeated targeting, or physical touch are required to allege sex-based harassment. To the contrary, the Fourth Circuit has emphasized that offensive verbal statements alone can constitute sex-based harassment,

*see Fairfax County Sch. Bd.*, 1 F.4th at 267, 275; *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 209–10 (4th Cir. 2014), and that even comments not directed towards the plaintiff can support a finding of sex-based harassment, *see Jennings*, 482 F.3d at 695.

*ii. Severity or Pervasiveness of Harassment (Hostile Educational Environment) & Denial of Equal Access to Educational Opportunities or Benefits*

Sex-based harassment is only actionable under Title IX "when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim [themselves] 'subjectively perceive[] . . . to be abusive.'" *Jennings*, 482 F.3d at 696 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To be actionable under Title IX, the harassment must be "so severe, pervasive, and objectively offensive," and "so undermine[] and detract[] from the victim['s] educational experience, that the victim-student[] [is] effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651–52. ACSB argues "Doe does not plausibly allege that the speaker event and its promotion created an 'environment that a reasonable person would find hostile or abusive,'" (Def.'s Br. at 17 (quoting *Jennings*, 482 F.3d at 696)), or that "Doe has been 'effectively denied equal access to [WAHS]'s resources and opportunities,'" (*id.* at 16 (quoting *Davis*, 526 U.S. at 651–52)).

Whether gender-based harassment constitutes "severe or pervasive" discrimination "depends on a constellation of surrounding circumstances, expectations, and relationships." *Davis,* 526 U.S. at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Indeed, "[t]here is no mathematically precise test for determining if an environment is objectively hostile or abusive." *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th

Cir. 2010) (cleaned up). But harassment must have a "systemic effect," and must be more than "a single instance of one-on-one peer harassment." *Davis,* 526 U.S. at 653. "Conduct may be frequent, severe, threatening, and/or humiliating where it . . . causes the victim serious anxiety, fear, or discomfort; or where a drop-off in academic performance coincides with the harassment." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 652 (D. Md. 2013), *aff'd*, 605 F. App'x 159 (4th Cir. 2015) (first citing *Davis*, 526 U.S. at 653; then *Jennings*, 482 F.3d at 698–99; and then *Davis*, 526 U.S. at 652) (cleaned up).

Here, the amended complaint plausibly alleges that Doe subjectively perceived the promotion of the Event, the views conveyed during the Event, and the commentary after as hostile and abusive. The Speaker's professed belief that Doe's gender identity does not exist is deeply demeaning to Doe and other gender diverse students. *See Fellers*, 2025 WL 1098271, at *12 ("[T]he symbolic message [opposing transgender girls' participation in girls' sports] included a demeaning and harassing assertion—an assertion of inauthenticity, falsity and nonexistence with respect to some students' core and immutable characteristics (*i.e.*, their gender identities). And, it seems evident that had the symbols been worn by students in school or during school activities, they could be barred as *reasonably interpreted in context to convey a harassing, demeaning message likely to have a serious negative psychological impact on students who identify as transgender*." (emphasis added)). Doe contends that the Event's message, as conveyed through the promotional materials and the Event itself, caused them to feel serious anxiety and discomfort. (*See* Am. Compl. ¶¶ 90–97.) They have "broken down sobbing, questioning why their gender identity—who they are—is offensive to others." (*Id.* ¶ 93.) This suffices to

plausibly allege Doe's subjective perception that the promotion and the Event were hostile and abusive.

To establish an *objectively* reasonable belief that the environment was hostile, a plaintiff must demonstrate that the environment was "permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions' of, in this case, the victim's educational environment." *Hayut v. State University of New York*, 352 F.3d 733, 744–45 (2d Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (cleaned up). Courts often look at the frequency of incidents, number of individuals involved, and ages of the harasser and victim as factors in determining whether the conduct is sufficiently severe and pervasive. *See Board of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d at 652. The relationship between the harasser and student is also relevant, as it "necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." *Davis*, 526 U.S. at 653.

Because the speaker is an adult, her remarks to the students—in which she denied the existence of Doe's and other students' gender identities and asserted that policies should only be rooted in biological sex—may be more harmful than if only students made such comments. *See Schiffbauer v. Schmidt*, 95 F. Supp. 3d 846, 859 (D. Md. 2015); *Davis*, 526 U.S. at 653. On the other hand, Cobb is not a WAHS teacher, and Doe does not include any other allegations suggesting that she is in a position of power or influence over Doe and other gender diverse students. *See Jennings*, 482 F.3d at 696.

Even though attendance at the Event was not required, it was held at lunchtime in the same building where Doe and other gender diverse youth were required to attend school. Including the promotion leading up to the Event and radio show comments made after the Event,[5] the amended complaint alleges that the harassing messages lasted for over a week. (*See* Am. Compl. ¶ 81 (alleging that the Club leaders made statements on a post-Event radio show that there are "only two genders" and that Doe's legal claims are "absolutely ridiculous").) And the student's derogatory statement made [redacted] at the Event—that "at a hood school, these trannies would get beaten up"—adds to an objective perception of hostility towards Doe. (*Id.* ¶ 79.)

For the sex-based harassment to be sufficiently "severe, pervasive, and objectively offensive" to give rise to Title IX liability, Doe must allege facts raising the plausible inference that the harassment deprived them of equal access to educational opportunities or benefits. *See Davis*, 526 U.S. at 651–52. Such a deprivation of access can be shown in "at least three different ways: if the harassment (1) results in the physical exclusion of the victim from an educational program or activity; (2) so undermines and detracts from the victim's educational experience as to effectively deny [them] equal access to an institution's resources and opportunities; or (3) has a concrete, negative effect on the victim's ability to participate in an educational program or activity." *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 275 (cleaned up). In determining whether this is met, "the factfinder must consider all of the 'surrounding

[5] Although these statements were not physically made in the school, the Fourth Circuit has recognized that online or out-of-school statements may still be relevant to Title IX sex-based harassment claims. *See Hurley*, 911 F.3d at 687 ("Although that harassment was communicated through cyberspace, the Complaint shows that [the institution] had substantial control over the context of the harassment because it actually transpired on campus.").

circumstances' and use '[c]ommon sense[] and an appropriate sensitivity to social context' to 'identify objectively hostile or abusive conduct.'" *Id.* (quoting *Jennings*, 482 F.3d at 696).

Like the plaintiff in *Jennings*, Doe has felt increasingly anxious and upset following the promotion and authorization of the Event. (*See* Am. Compl. ¶¶ 91–94, 96–97.) Doe alleges that the targeted nature of this Event has "taken an emotional toll." (*Id.* ¶ 94.) The amended complaint discusses some of the effects of Doe's mental and emotional distress following the Event, which includes: (1) being "emotionally and intellectually drained," (2) experiencing anxiety and gender dysphoria symptoms that "mak[e] it more challenging to actively participate in school," (3) suffering an emotional toll that "forc[ed] [Doe] to work even harder to actively participate in school programs and activities" and "[made] it even more difficult for [Doe] to go to school and focus on academic and extracurricular activities," and (4) "engag[ing] less in class discussions out of fear for sharing their viewpoint around others who support the denial of their existence." (Am. Compl. ¶¶ 93, 94, 96, 97.)

Doe's amended complaint does not allege any form of physical exclusion from an educational program or activity, nor does it allege that Doe is unable to participate in such programs or activities. Thus, Doe must plausibly allege that harassment has had some other concrete, negative effect on their ability to participate in school. As far as tangible or measurable effects on school participation or access, Doe alleges that they have engaged less in class discussions after the Event. This does not suffice to allege a *concrete* effect on their ability to participate in the educational opportunities and benefits provided by ACSB. *C.f. Doe by next friend Pullen-Smith v. Qually*, No. 5:20-cv-00523, 2021 WL 2546456, at *6 (E.D.N.C. June

21, 2021) (finding this prong met where "[plaintiff's] mental health deteriorated, she was unable to focus on schoolwork, she hid in the bathroom for up to three class periods a day to avoid harassment, she sat with her head down on her desk in class, she went to a teacher's classroom for lunch and did not go to the gym due to fear, she attempted suicide, and she missed a total of 38 days of school during a single academic year"); *Danvers as next friends of Danvers v. Loudoun Cnty. Sch. Bd.*, No. 1:21-cv-01028, 2022 WL 4585524, at *6 (E.D. Va. Sept. 29, 2022) (finding sufficient at the motion-to-dismiss stage the fact that plaintiff, in addition to grappling with anxiety, was "ultimately forced to transfer schools because of the alleged harassment"); *Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n*, No. RDB-20-3132, 2021 WL 2580385, at *16 (D. Md. June 23, 2021) ("[E]ach of these students allege they had to complete their education elsewhere because of their experiences, which suffices at [the motion to dismiss stage] to show that they were denied access to the educational opportunities or benefits provided by the school."); *see also Fairfax Cnty. Sch. Bd.*, 1 F.4th at 276 (upholding the jury's finding that there was a concrete, negative effect on plaintiff's educational participation where, *inter alia*, plaintiff's "academic performance and class attendance declined after the band trip," including seventeen absences in one year; plaintiff had to sit out of band class until the director rearranged the seating; and plaintiff had difficulty eating, sleeping, and concentrating such that she was diagnosed with adjustment disorder); *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 368–70 (S.D.N.Y. 2017) (noting that examples of concrete, negative effects "include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring therapy or medication," and finding that plaintiff's allegations that he feared

for his safety and physical wellbeing, that "[his] academic experience suffered," and that he was too fearful to use campus facilities were insufficient).

Doe does state that "the promotion of the Event . . . [had] a concrete, negative effect on [Doe] . . . and interfer[ed] with their ability to participate in school." (Am. Compl. ¶ 96.) But Doe cannot rely on conclusory assertions of concrete interference—and the singular, vague example of "engag[ing] less in class discussions"—to plausibly allege that they were denied access to educational opportunities. (*See id.* ¶ 97.) Accordingly, Doe does not allege sufficient facts to raise a reasonable inference that the harassment surrounding the Event deprived them of equal access to educational opportunities and benefits. *See Davis*, 526 U.S. at 650–51.

2. Basis for Imputing Liability to ACSB

Even if Doe had plausibly alleged actionable sex-based harassment, their Title IX claim would still be dismissed on deliberate indifference grounds.

Schools are only liable under Title IX for their "own misconduct." *Davis*, 526 U.S. at 640. Thus, for the final element of a sex-based harassment claim, a plaintiff must show that "there is a basis for imputing liability to the institution." *Jennings*, 482 F.3d at 695. Where, as here, the plaintiff is not claiming discrimination based on an official policy of the recipient, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). In other words,

Doe must plausibly allege that ACSB officials were "deliberately indifferent to known acts" of harassment or discrimination. *Davis*, 526 U.S. at 643, 647; *see Gebser*, 524 U.S. at 290 (defining deliberate indifference in this context as "an *official* decision by the recipient not to remedy the violation" (emphasis added)).

In cases involving "student-on-student harassment" or harassment perpetrated by other third parties, the Supreme Court has "set[] the bar high for deliberate indifference." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 76 (4th Cir. 2016). Deliberate indifference is only shown "where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; *see Hall v. Millersville Univ.*, 22 F.4th 397, 405 (3d Cir. 2022) (applying the *Davis* deliberate indifference standard to a harasser who was neither a teacher nor another student but was a guest of the student victim). Title IX liability for third-party harassment is appropriate only if the school "exercises substantial control over both the harasser and the context in which the known harassment occurs."[6] *Davis*, 526 U.S. at 645. "[N]either a school's negligence in addressing a sexual assault, nor its failure to provide the remedy wanted by the victim, constitutes deliberate

[6] In *Hall*, the Third Circuit emphasized that "[t]hough *Davis* concerned only deliberate indifference to known student-on-student harassment, the Court's holding was not based upon the classification of the harasser as a student, guest, or other type of third party." 22 F.4th at 405. "Instead, the Court's focus was on whether the funding recipient had control over the harasser and the context of the harassment since the funding recipient can only 'subject' students to discrimination under Title IX if it has control over the harasser and remains deliberately indifferent to the harasser's actions." *Id.*; *see Hurley*, 911 F.3d at 687–89 (using "substantial control" analysis to find that the defendant-university could be liable for online harassment because they "could exert substantial control over the context in which the harassment occurred and could exercise disciplinary authority over those UMW students"); *see also Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 232 (4th Cir. 2022) (holding that, in the Title VII context, "an employer is liable for a third party [non-employee] 'creating a hostile work environment if the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment'").

indifference under Title IX." *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 638 (W.D. Va. 2016) (collecting cases).

*i. Actual Knowledge or Notice*

To determine actual notice, the court does not look at "whether the university official *subjectively* understood that the plaintiff was making an allegation of sexual harassment or that the alleged harassment was actually occurring." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 265 (4th Cir. 2021). Rather, the plaintiff puts the institution on actual notice by "alleging facts that *objectively* amounted to sexual harassment." *Id.* (emphasis added). In other words, the actual notice or knowledge inquiry "asks whether an appropriate official in fact received such a report or complaint and whether a reasonable official would construe it as alleging misconduct prohibited by Title IX." *Id.* at 268.

First, the court agrees with ACSB that there are no factual allegations showing that anyone heard the derogatory comment made by a student [redacted] during the Event, much less that school employees or individuals with any authority to address the harassment were made aware of the comment. (*See* Am. Compl. ¶ 79.) Similarly, Doe does not allege that anyone informed ACSB of the radio show and online comments made after the Event. (*See id.* ¶ 81.) Nor does Doe allege that anyone made any reports to ACSB prior to the Event that peers were making any targeted comments to Doe or other gender diverse students like those allegedly made at and after the Event. Because Title IX only requires institutions to respond to "*known* peer harassment," *Davis*, 526 U.S. at 649, ACSB's failure to respond to these

incidents or impose disciplinary sanctions on the students who made these statements cannot serve as the basis for Doe's Title IX claim.

Doe does, however, allege that ACSB had sufficient notice of the Event's title, the promotional materials, the expected topic of discussion at the Event, and the general perspective of the Speaker based on her prior public comments regarding gender diversity. (*See* Am. Compl. ¶¶ 44–55, 63, 70–71.) Specifically, Doe states that the Club presented the Event flyer to Sublette; that after receiving a demand letter, Superintendent Haas and other ACSB leadership reversed Sublette's decision to have the Event after school hours; that ACSB received significant community backlash about the Event; that they heard public comment on October 9; that ACSB's community message acknowledged that many have felt angry, frustrated, and invalidated; and that they received a memo from Doe's counsel contending that the Event would denigrate gender-expansive students and involve *discriminatory* speech, would violate ACSB's rules against *harassment*, and could lead to Title IX liability. (*Id.* ¶¶ 44, 46, 50–55, 57–64; *see* Dkt. 41-3.) Thus, based on Doe's allegations, "an appropriate [ACSB] official in fact received such a report or complaint and . . . a reasonable official would construe it as alleging misconduct prohibited by Title IX." *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 268.

However, "[f]or a report to provide actual notice, . . . it must allege that a student 'was currently' being . . . harassed." *John Doe 2 v. N.C. State Univ.*, 125 F.4th 498, 505 (4th Cir. 2025) (quoting *Baynard v. Malone*, 268 F.3d 228, 238 n.9 (4th Cir. 2001)). "Reports that support only 'a general, *substantial risk* of—or the *potential* for—ongoing or future misconduct' cannot provide actual notice of 'current [sexual harassment].'" *Id.* (quoting *Fairfax Cnty.*, 1 F.4th at

265) (emphasis in original). Many of the reports made to ACSB before the Event were of *expected* or *predicted* harassment towards Doe and other gender-expansive students. (*See, e.g.*, Dkt. 41-3 at 3, 8.) These reports do not provide ACSB with "actual notice of current sexual harassment." *N.C. State Univ.*, 125 F.4th at 505 (cleaned up). But to the extent that Doe's counsel and others reported current harm stemming from the title of the Event and the promotional materials posted at the school leading up to the Event, ACSB had actual knowledge of this alleged harassment.

*ii. Unreasonableness of Response*

Finally, Doe must allege that Haas, Black, Sublette, or ACSB acted with deliberate indifference by responding in a way that was clearly unreasonable in light of the known circumstances. *See Davis*, 526 U.S. at 648. Deliberate indifference is shown when the institution and its officials "did not engage in efforts that were reasonably calculated to end the harassment." *Hurley*, 911 F.3d at 689 (cleaned up).

Doe's allegations of deliberate indifference are starkly contrasted with other cases where a plaintiff's Title IX claim has survived dismissal. Where courts have previously concluded that the plaintiff plausibly alleged deliberate indifference, the Title IX defendant often failed to respond *at all* to known violence or threats of violence. *See, e.g., Rex v. W. Virginia Sch. of Osteopathic Med.*, 119 F. Supp. 3d 542, 551 (S.D.W. Va. 2015) (finding deliberate indifference was sufficiently alleged where plaintiff claimed that the school "had no procedures in place" to respond to her reports of rape and harassment, that the school's "investigation was flawed and biased in favor of her attacker," and that the school "engaged in the

investigation with the intention of minimizing the incident, protecting the school's reputation, and putting the incident behind the institution"); *Doe 1 v. Roanoke Cnty. Sch. Bd.*, No. 7:22-cv-00163, 2023 WL 2674864, at *11–12 (W.D. Va. Mar. 29, 2023) (concluding that plaintiffs plausibly alleged deliberate indifference where school administrators merely "told [one of the students] to avoid [the coach]" and failed to enforce a closed-door policy in response to learning that a sports coach had developed inappropriate relationships with five students and met with at least one of the students alone in his office with the door closed); *DJ by & through Hughes v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307, 337 (E.D. Va. 2020).

Here, the alleged facts show that ACSB did not simply "remain idle" in response to known harassment. *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016). Rather, the allegations contain a series of actions taken by its leadership. First, Sublette met with the Club and expressed that "gender identity is a complex and controversial topic" such that the club should host the event after the school day has ended. (Am. Compl. ¶ 51.) Shortly after, ACPS issued a community message signed by Haas and others, which emphasized the voluntary nature of the event, underscored their expectations of "respectful conduct and nondiscrimination," and acknowledged students' constitutional rights to assemble. (*Id.* ¶ 57; Dkt. 41-2.) ACSB leadership made statements at the October 9 board meeting, then opened the floor up for public comment. (Am. Compl. ¶¶ 59–63.) Finally, ACSB took steps to add "police/security" at WAHS during the Event. (*Id.* ¶ 75.)

The court must determine whether Doe plausibly alleges that ACSB's actions were "clearly unreasonable." *See Davis*, 526 U.S. at 648. The Supreme Court has recognized that

"it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." *Davis*, 526 U.S. at 649; *see Hurley*, 911 F.3d at 686 ("Nor is an institution subject to Title IX liability when it refrains from a form of disciplinary action that would expose it to constitutional or statutory claims." (cleaned up)). Doe argues that this assertion was mere dicta in *Davis*. But lower courts "routinely afford substantial, if not controlling deference to dicta from the Supreme Court." *United States v. Gould*, 163 F.4th 795, 799 (4th Cir. 2026) (quoting *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc)). Further, this court does not seek to "establish a bright-line rule" based on this *Davis* dicta as Doe anticipates it might. (*See* Pl.'s Br. at 17–18 (Dkt. 47).) Instead, ACSB's exposure to constitutional claims in this case is just a single, albeit important, factor in the court's multifactor analysis of whether ACSB's response as alleged was clearly unreasonable. Had ACSB stopped the Event, they would have likely been sued by the authors of the initial demand letter. (*See* Dkt. 41-1.) And when considering (1) these threats of First Amendment claims against ACSB; (2) the complex, thorny nature of the relevant free speech doctrine[7]; and (3) the fact that many reports made to ACSB centered on expected or predicted

[7] Doe expresses disagreement with this court's earlier characterization of the First Amendment claims threatened against ACSB as involving nuanced and unsettled questions of law. (Pl.'s Br. at 18.) However, Doe does not present a single Fourth Circuit or Supreme Court case with comparable facts to the case at hand that clearly enables ACSB to ban the Event without issue. Moreover, many of the cases that Doe cites in their brief involve similar First Amendment issues in the school context, are not Fourth Circuit or Supreme Court cases, and directly underscore the difficulty of these questions. *See, e.g.*, *Fellers v. Kelley*, No. 24-CV-311-SM-AJ, 2025 WL 1098271, at *1 (D.N.H. Apr. 14, 2025) ("This case presents an increasingly common, and commonly difficult constitutional problem: When may public school authorities limit symbolic speech during school athletic contests to protect students from perceived harm?"). In fact, the First Circuit recently remanded *Fellers v. Kelley* back to the district court, finding that appellants "established a likelihood of success as to their viewpoint discrimination claim arising from the sanctions [a high school] imposed on them for their passive speech in wearing . . . wristbands" in protest against a transgender athlete on the soccer team. *See Fellers v. Kelley*, No. 25-1442, 2026 WL 2517131, at *1 (1st Cir. Aug. 26, 2026). While the court does not weigh in on the merits of any of the threatened First Amendment claims against ACSB, it stands by its earlier characterization. These legal questions—the clash of First Amendment rights with efforts to protect vulnerable students from demeaning language in their school—are complex.

harassment rather than present harassment; Doe's allegations do not raise a plausible inference that ACSB's decision to allow the Event to proceed—at lunchtime, with voluntary attendance, and with increased security—was clearly unreasonable.

In *Feminist Majority Foundation v. Hurley*, the defendant-university was hesitant to limit student-on-student online harassment—a "six-month harassment campaign directed at [the student organization] Feminists United and its members"—for fear of infringing on First Amendment free speech protections, like ACSB. 911 F.3d at 690–91. The *Hurley* court concluded that "First Amendment concerns do not render the University's response to the sexual harassment and threats legally sufficient for two sound reasons: (1) true threats are not protected speech, and (2) the University had several responsive options that did not present First Amendment concerns." *Id.* at 691. Doe's case is distinguishable first because the alleged harassment here does not involve a "true threat," nor does it clearly constitute some other form of unprotected speech. Unlike the *Hurley* online harassment, where "specific targets [were] identified and violent actions [were] vowed" through statements "threaten[ing] to 'euthanize,' 'kill,' and '[g]rape' Feminists United members," the alleged harassment surrounding the Event was neither specifically targeted at Doe nor reflected any intent to commit unlawful violence on Doe.[8] *Id.* at 692.

Second, Doe does not allege other steps ACSB could have taken that would not have implicated any First Amendment issues. When reviewing the district court's dismissal of

---

[8] The statement that an unidentified student made [redacted] at the Event referenced violence by stating "these trannies would get beaten up." (Am. Compl. ¶ 79.) However, even if this comment constitutes a true threat, it does not give rise to liability for reasons described in Subsection III.A.2.i; Doe does not allege that ACSB had any notice or knowledge of students making statements like this [redacted].

plaintiffs' Title IX claim, the *Hurley* court found that "plaintiffs sufficiently allege that [defendant] exhibited deliberate indifference to known instances of sexual harassment" because "although [the defendant] was not entirely unresponsive to allegations of harassment," it "did not engage in efforts that were reasonably calculated to end [the] harassment." *Id.* at 689–90 (cleaned up). But in *Hurley*, unlike in Doe's case, the plaintiffs' "[c]omplaint allege[d] that [the defendant] could have taken other steps in response to the harassment that would not have implicated any First Amendment concerns." *Id.* at 693. The Fourth Circuit held that "when an educational institution claims that it has done all it can to address instances of sexual harassment and threats, a reviewing court should consider whether the institution failed to take other obvious and reasonable steps." *Id.* Although Doe generally argues that "there were no other efforts made by Defendant to minimize the impact of the Event and its promotion on transgender and gender diverse students," (Pl.'s Br. at 17), they do not include any allegations in their amended complaint about measures ACSB could have taken to address harassment without exposing itself to First Amendment liability.[9]

Accordingly, Doe's amended complaint does not allege sufficient facts to support a plausible inference that ACSB was deliberately indifferent to known harassment. The court will grant ACSB's motion to dismiss the Title IX claim.

---

[9] Doe also alleges that ACSB "made material misrepresentations to the Court" at the hearing on Doe's motion for preliminary injunction that "students planning to participate in the Event were required to sign up in advance and participation was capped at one hundred students." (Am. Compl. ¶ 66.) There was in fact no sign-up requirement for attendees, and over two hundred students were allowed to attend. (*Id.* ¶ 68.) First, the court's decision to deny the preliminary injunction did not turn on the existence of a sign-up requirement or attendance cap. Second, it does not appear that these features would have prevented or alleviated the alleged harassment of Doe and other gender diverse students. Accordingly, the court does not find such facts to be material to the analysis.

**B. Article III Standing for Injunctive Relief**

ACSB also argues that Doe lacks Article III standing to seek the requested prospective injunctive relief because they have not shown a sufficiently imminent or ongoing injury to warrant prospective relief. (Def.'s Br. at 10–12.) To the extent that Article III standing arguments could divest a court of jurisdiction over a claim, the court should address the Rule 12(b)(1) standing issue before proceeding to analyze the Rule 12(b)(6) assertions. *See Schmidt v. City of Norfolk*, No. 2:24-cv-00621, 2025 WL 410080, at *5 (E.D. Va. Feb. 5, 2025). That said, ACSB only challenges Doe's standing to seek injunctive relief as one of several requested forms of relief. (*See* Am. Compl. at 21–22 (requesting declaratory relief, compensatory damages, and reasonable costs and attorney's fees in addition to the permanent injunction).) Thus, regardless of Doe's standing for prospective injunctive relief, this court has jurisdiction to consider Doe's Title IX claim for other forms of relief.

ACSB contends that the court should dismiss Doe's request for a permanent injunction prohibiting ACSB from permitting certain speakers, events, displays, and speech pursuant to Rule 12(b)(1) because they do not allege that these forms of speech are imminently likely to occur at WAHS and harm Doe while they are still a student. (Def.'s Br. at 10–12.) When a plaintiff seeks a permanent injunction, they must make a "showing of [a] real or immediate threat that [they] will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). It is not enough to show that "there is an 'objectively reasonable likelihood' that [the alleged future injury] will someday come to pass." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 429 (4th Cir. 2025) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). Rather, "the

plaintiffs must show a substantial risk that" it will occur "in the near future." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," unless the plaintiff can demonstrate "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Doe argues that they have "demonstrat[ed] an ongoing injury," such that they have satisfied the Article III requirements for prospective injunctive relief. (Pl.'s Br. at 5–6 (quoting *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022).) Indeed, "'continuing, present adverse effects' from past illegal conduct can suffice" to show injury-in-fact for an injunction. *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 680 (4th Cir. 2020) (quoting *O'Shea*, 414 U.S. at 495–96). Here, Doe alleges that they continue to experience certain effects from the Event and the surrounding circumstances—a loss of trust in ACSB's ability to protect them from discrimination, increased feelings of anxiety, and difficulty going to school and engaging in class. (Am. Compl. ¶¶ 92–97.) Although present adverse effects of a past injury can satisfy the injury-in-fact requirement, *Outdoor Amusement Bus. Ass'n*, 983 F.3d at 680, "[t]he emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant," *Lyons*, 461 U.S. at 107 n.8; *see Savage v. Maryland*, 896 F.3d 260, 274–75 (4th Cir. 2018) (holding that "continuing 'emotional consequences' from [defendant's] prior acts are not enough" for plaintiff to seek prospective injunctive relief). In *Jonathan R. by Next Friend Dixon v. Morrisey*, the court found ongoing injury sufficient for standing, but where the allegations of injury were "not limited to isolated incidents of past abuse," and where the plaintiff class cited evidence

of "chronic and system-wide failures" causing repeated injury to the plaintiffs. 178 F.4th 139, 163–64 (4th Cir. 2026). Here, Doe alleges adverse effects stemming from the circumstances surrounding a single Event, as opposed to "uncured systemic policy failures that place [plaintiffs] in positions where they suffer ongoing constitutional and statutory rights deprivations." *Id.* at 164.

Additionally, Doe relies on speculation and conjecture to argue that they will be subject to ACSB's allegedly unlawful conduct in the immediate future. *See Lyons*, 461 U.S. at 102. It is not enough for Doe to assume, without alleging factual support, that since the contested Event and ACSB's authorization occurred once, ACSB's deliberate indifference to another similar event or form of harassment is "certainly impending." *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Doe does not allege any "concrete or consistently-implemented policies" that could produce imminent, future injury. *Outdoor Amusement Bus. Ass'n*, 983 F.3d at 680 (cleaned up).

Because Doe fails to allege such systematic, ongoing injury, or a real and immediate threat of future repeated injury, Doe does not have standing to request prospective injunctive relief.

## IV. Conclusion

For the foregoing reasons, the court will grant Defendants' motions to dismiss. (Dkts. 40, 44.) Doe's Title IX claim will be dismissed without prejudice and with leave to amend. Doe may file an amended complaint no later than 21 days after the date of the accompanying Order.

An appropriate Order will issue.

**ENTERED** this 14th day of September, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE